B. C. Cook & Sons, Inc., Petitioner v. Commissioner of
Internal Revenue, Respondent

Docket No. 1009-74.    Filed December 1, 1975.

*Michel G. Emmanuel, Michael D. Annis,* and *Joseph D. Edwards,* for the petitioner.
*Donald W. Williamson, Jr.,* for the respondent.

### OPINION

STERRETT, *Judge:* The respondent determined deficiencies in petitioner's Federal income taxes for the fiscal years ended September 30, 1958, September 30, 1959, September 30, 1960, and September 30, 1961. The only issue in controversy is whether respondent is entitled to adjust petitioner's Federal income tax liability for those years pursuant to sections 1311 through 1314.

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

B. C. Cook & Sons, Inc. (hereinafter petitioner), is a Florida corporation, with its principal office in Haines City, Fla. Its corporate income tax returns for its fiscal years ended September 30, 1958, September 30, 1959, September 30, 1960, and September 30, 1961, were filed with the District Director of Internal Revenue for the District of Florida.

At all times pertinent hereto, petitioner was engaged in the business of acquiring citrus fruit for distribution to processing plants.

During its fiscal year ended September 30, 1965, petitioner discovered that an employee had embezzled substantial sums of money over a period of years extending at least from 1958 through 1965.

Petitioner had hired the employee as a bookkeeper at the time the corporation was organized in November 1956. He was au-

thorized, among other things, to write checks, to place them before a corporate officer for signature, and to record expenditures in the corporate books of account. In this capacity he prepared checks to pay for fruit purchases.

Commencing at least with a check dated January 20, 1958, and continuing at least through January 11, 1965, the employee caused checks to be drawn on petitioner's bank account to J. C. Jackson, a fictitious name used by the employee. The employee deposited the checks in a local bank to an account styled J. C. Jackson, which was in reality owned by him, and he ultimately received the proceeds of the checks.

The checks to J. C. Jackson were reflected on petitioner's books as payments for fruit purchases. In fact, no fruit was ever purchased from J. C. Jackson or the employee and none was at any time physically included in petitioner's inventory.

On its income tax returns for the fiscal years ended September 30, 1958, through September 30, 1965, petitioner reflected fruit purchases, in computing its costs of goods sold and/or cost of operations, as follows:

| Fiscal year | Amount | Fiscal year | Amount |
|---|---|---|---|
| 1958 | $5,921,077 | 1962 | $8,489,741 |
| 1959 | 12,680,523 | 1963 | 6,892,574 |
| 1960 | 8,774,972 | 1964 | 14,556,888 |
| 1961 | 12,120,781 | 1965 | 9,783,091 |

The checks to J. C. Jackson were included in these amounts, with the exception of the 1965 fiscal year on which return petitioner claimed the entire embezzlement loss as a deduction under section 165, I.R.C. 1954.[1]

As a result of including the checks to J. C. Jackson in its cost of goods sold and/or in its cost of operations, petitioner's gross income for each taxable year involved was understated by the amount of the checks drawn in each of such years, and its taxable income was similarly understated in each of such years.

The amounts known to have been embezzled in each of petitioner's fiscal years 1958 through 1965 are as follows:

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

| Fiscal year | Amount | Fiscal year | Amount |
|---|---|---|---|
| 1958 | $49,750.00 | 1962 | $103,250.00 |
| 1959 | 107,150.00 | 1963 | 100,087.50 |
| 1960 | 111,750.00 | 1964 | 165,625.00 |
| 1961 | 132,750.00 | 1965 | 101,850.00 |
| | | | $872,212.50 |

Additional amounts may or may not have been embezzled from petitioner.

Of the total amount of $872,212.50 known to have been embezzled, petitioner recovered from the employee the amount of $254,595.98 during its 1965 fiscal year.

On its income tax return filed for the fiscal year 1965, petitioner claimed as a deduction an embezzlement loss in the amount of $605,116.52, computed as follows:

| Fiscal year | Amount of loss |
|---|---|
| 1958 | $37,250.00 |
| 1959 | 107,150.00 |
| 1960 | 111,750.00 |
| 1961 | 132,750.00 |
| 1962 | 103,250.00 |
| 1963 | 100,087.50 |
| 1964 | 165,625.00 |
| 1965 | 101,850.00 |
| Total | 859,712.50 |
| Less recovery | 254,595.98 |
| Loss claimed | 605,116.52 |

The amount of loss so claimed corresponds with the amount of the aforementioned checks except for the fiscal year 1958. For that year the checks totaled $49,750 rather than the amount of $37,250 as set out on petitioner's return filed for its 1965 fiscal year. This is a difference of $12,500 and is represented by check number 1515 in that amount issued on March 3, 1958, to J. C. Jackson.

The embezzlement loss for the 1965 fiscal year was not added to petitioner's cost of goods sold in that year but rather was claimed as a deduction under section 165.

The return filed by petitioner for its 1965 fiscal year reflected a net operating loss in the amount of $383,923.65. Of this amount, $17,567 was deducted as a net operating loss carryback to its 1962 fiscal year; $118,490 was deducted as a net operating

loss carryback to its 1963 fiscal year; and $247,867 was deducted as a net operating loss carryback to its 1964 fiscal year.

In a prior statutory notice of deficiency issued to petitioner on November 6, 1970, with respect to the fiscal years ended September 30, 1962, to September 30, 1965, inclusive, respondent determined that the deduction of $605,116.52, claimed as an embezzlement loss on petitioner's return filed for its 1965 fiscal year was not allowable to the extent of $388,900. The amount disallowed by respondent was attributable to embezzlements in the following fiscal years and in the following amounts:

| Fiscal year | Amount | Fiscal year | Amount |
|---|---|---|---|
| 1958 | $37,250 | 1960 | $111,750 |
| 1959 | 107,150 | 1961 | 132,750 |
| | | | $388,900 |

These are the years and amounts involved in the instant proceeding.

At the time respondent issued his prior statutory notice of deficiency, he was barred by section 6501 from assessing and collecting additional income taxes for petitioner's fiscal years 1958 through 1961, except insofar as sections 1311 through 1315 might have been applicable.

On January 28, 1971, petitioner filed a timely petition with this Court seeking a redetermination of respondent's determination. The petition and proceeding were assigned docket No. 692-71.

The opinion of this Court in that matter was filed on December 29, 1972, and is reported at 59 T.C. 516 (1972). The decision therein, allowing the deduction for the embezzlement loss, was entered on February 2, 1973; the appeal period expired on May 3, 1973, and no appeal was taken from such decision. Thus, that decision became final on May 3, 1973.

The final decision entered by this Court in B. C. Cook & Sons, Inc., 59 T.C. 516 (1972), represents a "determination" within the meaning of section 1313(a)(1).

Respondent's statutory notice determining the deficiencies in income taxes against petitioner for the fiscal years ended September 30, 1958, through September 30, 1961, which are involved here, was sent to petitioner by certified mail on November

15, 1973, which date was prior to the expiration of the 1-year period of limitations set forth in section 1314(b).

If sections 1311 through 1315 are applicable to permit assessment and collection of the deficiencies in income taxes for the fiscal years 1958 through 1961, the deficiencies as determined by respondent in his statutory notice dated November 15, 1973, are computed correctly in accordance with section 1314(a), based on the known embezzlements set forth above.

On February 11, 1974, petitioner filed a petition with this Court seeking a redetermination of respondent's determination with respect to its fiscal years 1958 through 1961, inclusive.

On September 10, 1974, respondent filed a Motion for Summary Judgment pursuant to Rule 121, Tax Court Rules of Practice and Procedure.

On October 18, 1974, petitioner filed a response to respondent's Motion for Summary Judgment opposing the granting of said motion and requesting that a hearing be set. The hearing was held on December 2, 1974.

The facts may be briefly summarized. From 1958 through 1965 one of petitioner's employees embezzled from it substantial sums of money by writing checks for fictitious fruit purchases. Petitioner's cost of goods sold was correspondingly overstated, and its gross income and taxable income were correspondingly understated for each of the fiscal years herein involved. In 1965 the scheme was discovered and petitioner claimed the embezzlement losses as a deduction under section 165(a) and (e). Our earlier decision in *B. C. Cook & Sons, Inc.,* 59 T.C. 516 (1972), allowed the deduction. On November 15, 1973, respondent mailed his statutory notice of deficiency for the fiscal years 1958, 1959, 1960, and 1961. On that date he was barred from assessing and collecting any additional taxes by section 6501, except as may be provided by sections 1311 through 1314.

Section 1311(a) provides:

(a) GENERAL RULE.—If a determination (as defined in section 1313) is described in one or more of the paragraphs of section 1312 and, on the date of the determination, correction of the effect of the error referred to in the applicable paragraph of section 1312 is prevented by the operation of any law or rule of law, * * * then the effect of the error shall be corrected by an adjustment made in the amount and in the manner specified in section 1314.

Section 1311(b) sets forth conditions necessary for an adjustment. Subparagraph (1) permits an adjustment only if the party

who was successful in the "determination" maintained a position inconsistent with the erroneous treatment which position was adopted in the "determination."

The parties agree that our prior decision in *B. C. Cook & Sons, Inc., supra,* is a "determination" on the date of which correction of the overstatements in cost of goods sold in 1958, 1959, 1960, and 1961 was barred by section 6501. The controverted points are (1) whether the facts presented fall within any of the circumstances described in section 1312, and (2) whether petitioner has maintained an inconsistent position. Our resolution of the former makes it unnecessary to decide the latter issue.

Respondent's position is that section 1312(2) encompasses the factual setting before us.[2] He argues that the legislative history demonstrates that Congress intended the words, "double allowance of a deduction or credit" in section 1312(2) to include any position taken by a taxpayer which would result in a double reduction of tax. He urges that a broad interpretation is necessary to effectuate the purpose of the mitigation provisions.

Respondent relies heavily on the following statement appearing in the report of the Senate Finance Committee, S. Rept. No. 1567, 75th Cong., 3d Sess. (1938), 1939-1 (Part 2) C.B. 779, 815:

> The legislation here proposed is based upon the following principles:
> * * *
> (2) Subject to the foregoing principles, disputes as to the year in which income or deductions belong, or as to the person who should have the tax burden of income or the tax benefit of deductions, should never result in a double tax or a double reduction of tax, or an inequitable avoidance of tax.[3]

He interprets this to mean that the mitigation provisions are designed to encompass any situation involving a double tax benefit. We do not agree.

---

[2] SEC. 1312. CIRCUMSTANCES OF ADJUSTMENT.

The circumstances under which the adjustment provided in section 1311 is authorized are as follows:
* * *

(2) DOUBLE ALLOWANCE OF A DEDUCTION OR CREDIT.—The determination allows a deduction or credit which was erroneously allowed to the taxpayer for another taxable year * * *

[3] This is the Senate report accompanying sec. 820 of the Revenue Act of 1938, 52 Stat. 581, which contained the first mitigation provisions. The language of sec. 820(b)(2) of that Act is substantially identical to that of sec. 1312(2).

The statement does not even purport to deal with the concrete circumstances covered by sections 1311 through 1314. It is only one of the general principles upon which those sections are based. The following statement from the conference report, H. Rept. No. 2330, 75th Cong., 3d Sess. (1938), 1939-1 (Part 2) C.B. 817, 835, belies respondent's interpretation:

This amendment provides for mitigation of *some* of the inequities under the income-tax laws caused by the statute of limitation and other provisions which now prevent equitable adjustment of various income-tax hardships. * * * The Senate amendment was drawn to discourage this practice in *specified types* of cases by authorizing corrective adjustment.[4] [Emphasis supplied.]

A reading of the two statements together convinces us that Congress intended to preclude the possibility of a double tax benefit only in the specific circumstances set forth in section 1312. It is with this in mind that we construe the statute.

We conclude that the instant facts are not within the scope of section 1312(2). Concededly, our "determination" in *B. C. Cook & Sons, Inc., supra,* allowed a deduction for petitioner's 1965 taxable year. It is not, however, a *deduction* "which was erroneously allowed to the taxpayer for another taxable year."

In the fiscal years involved, petitioner erroneously overstated its cost of goods sold and consequently understated its gross income and taxable income. It is true that the same result would have obtained had petitioner erroneously claimed an itemized deduction for cost of goods sold. However, there is a crucial distinction between the treatment of either basis or cost of goods sold and deductible expenses. Both basis and cost of goods sold are offsets employed in the computation of gross income, section 1001(a); sec. 1.61-3(a), Income Tax Regs. Itemized deductions, on the other hand, are subtracted from gross income in arriving at taxable income.

In *Estate of Walter E. Dorn,* 54 T.C. 1651 (1970), this Court recognized the importance of this fundamental distinction. In interpreting the meaning of the word "deduction" in section 642(g) we stated:

Respondent contends here, as he did in *Bray,* that there is no distinction in operation and effect between an offset and deduction warranting the variant treatment given them in *Bray.* Both the offset and statutory deduction serve to reduce the gain realized or increase losses sustained. Thus, respondent argues,

---

4 This is the conference report accompanying sec. 820 of the Revenue Act of 1938, 52 Stat. 581.

the policy underlying section 642(g), which is the denial of a double advantage from deductions available with respect to both income and estate taxes, is equally applicable to offsets and deductions. * * *

While the offset and deduction bear the similarity suggested by respondent, they differ markedly in character and tax treatment. As pointed out in *Bray,* selling expenses are fundamentally capital expenditures akin to those which are added to the cost of property. As such they are not deductible but may be utilized only as a reduction of the sales proceeds. * * * Furthermore, offsets, as in the case of basis, are taken into consideration in arriving at gross income. Gross income with respect to dealings in property is defined as the "gain" from such dealings. Sec. 61(a)(3). The term "gain," in turn, is described as the amount realized upon sale of the property less its adjusted basis. Selling expenses, whether viewed as a reduction of the amount realized or an addition to basis, reduce the amount of gain and hence the gross income resulting from the transaction. Statutory deductions, on the other hand, do not affect gross income but are subtracted therefrom in determining taxable income.

Respondent, in seeking to include offsets within the term "deduction" in section 642(g), ignores the fundamental distinctions outlined above. Such distinctions are not mere matters of form. Failure to take account of basis or offset in determining gross income would, for reasons indicated above, result in the taxation of gross receipts rather than gross income, contrary to the express purpose and statutory scheme of the Code. Moreover, the nontaxability of selling expenses in the present situation results from the absence of statutory provisions requiring their inclusion in gross income rather than from the deductibility of such expenses as in the case of true deductions. Congress, in its enactment of section 642(g), evidenced an intent to deny "deductions," often referred to as matters of legislative grace, rather than offsets which cannot be so classified. * * * [Fn. refs. omitted. *Estate of Walter E. Dorn,* 54 T.C. 1651, 1654, 1655 (1970).]

This distinction was also recognized by the Ninth Circuit Court of Appeals in *Curtis Gallery & Library, Inc. v. United States,* 388 F. 2d 358 (9th Cir. 1967). In holding therein that an overstatement of gross income was not the equivalent of a deduction within the meaning of section 1312 the court stated at page 361:

During the proceedings in the trial court, the government suggested that paragraph (4) might apply, and the trial court accepted the suggestion. Before us, both the government and the taxpayers say that the paragraph does not apply. They are right. Paragraph (4) reads:

"(4) Double disallowance of a deduction or credit.—The determination disallows a deduction or credit which should have been allowed to, but was not allowed to, the taxpayer for another taxable year, or to a related taxpayer."

Here, the Commissioner did disallow the taxpayers' claimed deduction for 1956. But, as applied to the earlier years, there is not here involved either a deduction or a credit that should have been allowed in any of those years. Throughout the code, deductions are referred to as amounts paid or incurred by

the taxpayer that may be subtracted from gross income in order to arrive at taxable income. See, e. g., sections 161-182, 211-217. The Commissioner did not disallow any deductions in prior years. He merely accepted the taxpayers' own overstatement of their income. A correction of that error would not have been the allowance of a deduction. * * *

See also *Estate of Viola E. Bray,* 46 T.C. 577 (1966); *J. T. Bridges,* 64 T.C. 968 (1975).

The mitigation provisions are extremely complex and are written with great precision. "Deduction" appears several times in section 1312, but nowhere is it used in connection with errors relating to gross income. Rather, the terms "inclusion," "exclusion," and "omission," are used to describe such errors. We also note that the language of section 1312(2) parallels the language of section 161 which reads: "In computing taxable income under section 63(a), there shall be *allowed as deductions* the items specified in this part." (Emphasis supplied.) Where a phrase is used in different parts of the same statute it will be presumed to have the same meaning throughout. *Atlantic Cleaners & Dryers, Inc. v. United States,* 286 U.S. 427 (1932); *Commissioner v. Ridgway's Estate,* 291 F. 2d 257, 259 (3d Cir. 1961). It is apparent that Congress used the word "deduction" as a term of art. This proves to us that Congress intended "deduction" in section 1312(2) to include deductions from gross income in arriving at taxable income and only that.

In *James Brennen,* 20 T.C. 495 (1953), this Court was presented a similar situation in sections 1311 through 1315 context. The taxpayer had purchased bonds in 1944 which he sold in 1945. He claimed a deduction in 1944 for amortizable bond premium, made a downward adjustment in basis, and reported a corresponding increase in gain on the sale of the bonds in 1945. The respondent reversed these steps, determined a deficiency for 1944, and granted a refund for 1945. The taxpayer accepted the refund, which was premised on the increased 1945 basis, and successfully contested the 1944 deficiency in this Court. The respondent then determined a deficiency for 1945, the assessment and collection of which were barred, except for section 3801, I.R.C. 1939. He argued for the applicability of section 3801(b)(2), I.R.C. 1939, which is substantially identical to section 1312(2). We held that, "the amount of the deduction was a factor in adjusting the basis of the bonds for the purpose of determining the taxable gain on their sale in 1945, but that is a

different matter from claiming 'a deduction' in 1945." *James Brennen, supra* at 500.[5] See also *Harry Landau,* 21 T.C. 414 (1953).

In *Max Schulman,* 21 T.C. 403 (1953), the facts were identical to those involved in *James Brennen, supra.* Respondent made the argument that section 3801(b)(3), I.R.C. 1939, was applicable.[6] In further explication of our position we said:

> Respondent, in invoking subsection (b)(3), argues that a deduction from gross income is equivalent to an exclusion from gross income for the purposes of subsection (b)(3). The respondent cites no authority in support of this novel contention, and, in our opinion, it is without merit. [*Max Schulman,* 21 T.C. 403, 407 (1953).]

These cases give recognition to the statutory scheme of the Code and the fundamental differences therein between the tax treatment of either basis or cost of goods sold and itemized deductions. The precise terminology of section 1312 makes clear that Congress is cognizant of this distinction. This awareness is further demonstrated by sections 6501(e)(1)(A)(i)[7] and 1382(a).[8] Had Congress intended section 1312(2) to include

---

[5] Congress has implicitly expressed approval of our decision in *James Brennen,* 20 T.C. 495 (1953). Subsequent to that decision several substantive changes were made expanding the circumstances encompassed by sec. 1312. No change was made, however, expanding the scope of sec. 1312(2) to reach the facts of that case.

[6] SEC. 3801. MITIGATION OF EFFECT OF LIMITATION AND OTHER PROVISIONS IN INCOME TAX CASES.

(b) CIRCUMSTANCES OF ADJUSTMENT.—When a determination under the income tax laws—
  * * *
(3) Requires the exclusion from gross income of an item with respect to which tax was paid and which was erroneously excluded or omitted from the gross income of the taxpayer for another taxable year or from the gross income of a related taxpayer; or * * *

[7] SEC. 6501(e). SUBSTANTIAL OMISSION OF ITEMS.—Except as otherwise provided in subsection (c)—
(1) INCOME TAXES.—In the case of any tax imposed by subtitle A—
  (A) GENERAL RULE.—If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph—
    (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; * * *

[8] SEC. 1382. TAXABLE INCOME OF COOPERATIVES.

(a) GROSS INCOME.—Except as provided in subsection (b), the gross income of any organization to which this part applies shall be determined without any adjustment (as a reduction in gross receipts, an increase in cost of goods sold, or otherwise) by reason of any allocation or distribution to a patron out of the net earnings of such organization or by reason of any amount paid to a patron as a per-unit allocation (as defined in section 1388(f)).

reductions in arriving at gross income it would have so indicated in clear, unambiguous terms. Absent such a statement, we are convinced that the word "deduction" in section 1312(2) refers only to deductions subtracted from gross income in arriving at taxable income.

It may be fairly said that petitioner has not turned the appropriate square corner with its Government. It has availed itself of a situation which slips between the statutory cracks to gain an unwarranted tax advantage. Nonetheless, it is entitled to our unprejudiced interpretation of the law in issue.

> *An appropriate order will be issued denying respondent's Motion for Summary Judgment and petitioner is invited to submit such a motion on its own behalf.*

Reviewed by the Court.

FEATHERSTON, *J.,* did not participate in the consideration or disposition of this case.

DAWSON, *C.J.,* concurring: As much as I abhor the obvious windfall to this petitioner, I think the majority opinion is technically correct in holding that the overstatement of cost of goods sold is not a "deduction" within the meaning of section 1312(2) of the Code.

Knowing what I know now, I must say that I believe I was wrong the first time in *B. C. Cook & Sons, Inc.,* 59 T.C. 516 (1972). Upon further reflection it seems to me that the dissenting judges in the prior case were right and had the sounder rationale. This time I have simply decided to go along with the majority so that we can avoid producing more bad law in this already bad case.

QUEALY and GOFFE, *JJ.,* agree with this concurring opinion.

FORRESTER, *J.,* concurring: I joined the concurring opinion of Tannenwald, *J., B. C. Cook & Sons., Inc.,* 59 T.C. 516 (1972), docket No. 692-71, and I again join his concurring opinion here.

TANNENWALD, *J.,* concurring: The key to this case lies in determining whether the *same* item is involved in both the later

years and the earlier years. Thus, respondent's regulations provide that "if the taxpayer deducted *an item* in an earlier year which is now closed and he successfully contends that *the item* should be deducted in a later year, then the correction of the effect of the erroneous deduction of *that item* in the closed year may be made since the taxpayer has taken a position inconsistent with the treatment of such item in such earlier year."[1] (Emphasis added.) See sec. 1.1311(a)-1(b), Income Tax Regs. Here, as I pointed out in my concurring opinion in the earlier related case, two different items are involved. See 59 T.C. at 523. My reference to the mitigation provisions (secs. 1311-1315) simply indicated the possibility that respondent *might* have a remedy under these sections but did not conclude that such remedy in fact existed. See 59 T.C. at 525. Interlaced with the same item issue is the coordinate issue under the mitigation provisions as to whether petitioner has maintained the necessary inconsistent position. As I see it, petitioner simply maintained in the prior case that, whatever the proper result in the earlier years, it was entitled to an embezzlement loss in the later year. Cf. *Kent Homes, Inc. v. Commissioner,* 455 F. 2d 316 (10th Cir. 1972), revg. 55 T.C. 820 (1971).

FORRESTER, *J.,* agrees with this concurring opinion.

DRENNEN, *J.,* dissenting: The issue in this case concerns the construction and application of the mitigating provisions contained in sections 1311-1315 of the Code. Specifically, the question is whether Congress intended to use the words "deduction or credit" in section 1312(2) in the limited "term of art" sense attributed to it by the majority or in a broader sense that would provide the relief respondent justifiably seeks in this case. In my view the purpose for which these provisions of the Code were enacted suggests the broader use.

In the report of the Senate Finance Committee, S. Rept. No. 1567, 75th Cong., 3d Sess. (1938), 1939-1 (Part 2) C.B. 779, 815, concerning these provisions, it was pointed out that under

---

[1] I recognize that the statutory provisions use the word "item" only in connection with omissions from gross income and not in connection with a "deduction or credit." In my opinion, no significance should attach to this dichotomy because it would appear that any "deduction or credit" would necessarily have to involve the same item. Consequently, the use of the word "item" in connection with a "deduction or credit" would have been superfluous.

existing law unfair benefits had been obtained by the taxpayer or the Commissioner assuming inconsistent positions and then taking shelter behind the barrier of the statute of limitations, and that this was a plain misuse of the fundamental purpose of these statutes; that the Federal courts in some tax cases had sought to prevent such inequitable results by applying various equitable principles; but that legislation had long been needed to supplement the equitable principles applied by the courts and to check the growing volume of litigation by taking the profit out of inconsistency. After setting forth certain principles on which the proposed legislation was based, the report stated:

(2) Subject to the foregoing principles, disputes as to the year in which income or deductions belong, or as to the person who should have the tax burden of income or the tax benefit of deductions, should never result in a double tax or a double reduction of tax, or an inequitable avoidance of tax.

There is no question in my mind that the position taken by petitioner in claiming and being allowed a deduction for an embezzlement loss for 1965 in *B. C. Cook & Sons, Inc.,* was inconsistent with the reduction of taxable income in the years 1958-61, "whether fortuitous or the result of design," because of the increase in cost of goods sold in those years resulting from the same scheme of embezzlement that gave rise to the embezzlement loss; and that the "double reduction of tax," or "inequitable avoidance of tax" resulting from such inconsistent positions falls clearly within the intended scope of the mitigation provisions. Yet the majority rely on technical distinctions between "deductions" from gross income and reductions of or offsets against gross income to deny the applicability of the mitigation provisions.

I find nothing in the legislative history or purpose of the mitigation provisions that suggests that Congress intended to use the words "deduction or credit" in section 1312(2) in such a limited or technical sense as ascribed to them by the majority. The purpose of the statute was to avoid abuse of the statute of limitations to obtain inequitable tax benefits. In my view a liberal interpretation of the words used would best accomplish that objective when all the other requisites are present as they are here. I would agree that the mitigation provisions were probably not intended to cure all abuses of the statute of limitations but I think the circumstances of this case qualify for the benefits thereof. Congress was concerned with double

deductions and credits which produced tax avoidance, not with the fine distinctions between deductions from gross income and reductions of gross income. This is particularly true here where the very same actions or transactions of the embezzler gave rise to both the reductions in gross income in the years 1958-61 and the loss deduction this Court allowed for 1965.

While it is true that in the cases cited in the majority opinion the courts have ascribed a limited meaning to the word "deduction" under certain circumstances, it is also true that the word is often used in a very general sense in ordinary tax parlance. It is a recognized rule of statutory construction that the same word or phrase appearing in different places in the internal revenue laws themselves may have different meanings depending upon the context and legislative purpose involved. See *Helvering v. Stockholms &c. Bank,* 293 U.S. 84, 86-88 (1934); *Helvering v. Morgan's, Inc.,* 293 U.S. 121, 128 (1934); cf. *Rohmer v. Commissioner,* 153 F.2d 61, 65 (2d Cir. 1946). *John D. McComish,* 64 T.C. 909 (1975). Since the avowed purpose of Congress in enacting the mitigation provisions was to prevent the avoidance or overpayment of tax by taking inconsistent positions and then relying on the statute of limitations, I cannot conceive that Congress would have purposefully used the word in these sections in a narrow sense that would make the provisions inapplicable unless specifically mentioned in the law. It would be impractical for Congress to enumerate all of the specific circumstances in which the provisions could be applied.

In construing a statute, the Supreme Court has said:

> There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one "plainly at variance with the policy of the legislation as a whole" this Court has followed that purpose, rather than the literal words. * * * [Fn. ref. omitted. *United States v. Amer. Trucking Assns.,* 310 U.S. 534, 543 (1940).]

> The strict letter of an act must, however, yield to its evident spirit and purpose, when this is necessary to give effect to the intent of Congress. * * * *[Fleischmann Co. v. United States,* 270 U.S. 349, 360 (1926).]

> Statutes are not to be so literally construed as to defeat the purpose of the legislature. * * * *[Hill v. American Surety Co.,* 200 U.S. 197, 203 (1906).]

In my opinion respondent will be justifiably confused by the result reached by the majority. In the earlier *B. C. Cook & Sons, Inc.,* case in which this Court allowed the loss deduction for 1965, 59 T.C. 516, the majority opinion repeatedly referred to the increases in cost of goods sold by the fictitious invoices as though they were tantamount to deductions. Respondent's argument was that where the taxpayer has previously derived a tax benefit through an erroneous *deduction* or otherwise, he may not deduct the same amount in a subsequent year after the Commissioner is barred by the statute of limitations from adjusting the tax for the prior year. Our majority opinion stated: "But the key to the decision here lies in the fact that the petitioner *erroneously* deducted nonexistent purchases in computing its cost of goods sold for prior years." Petitioner asserted in its reply brief that the proper procedure for respondent to follow if he believed that petitioner had received a double benefit was under the mitigation provisions. And finally our opinion stated that *"the deduction* must be allowed in its proper year and that the Commissioner's recourse is through the correction procedures set forth in sections 1311 through 1315." (Emphasis added.) Certainly the majority of this Court was equating the increase in costs of goods sold as a deduction similar to that allowed for 1965, and I fail to understand why the present majority relies on technical distinctions to deny the recourse suggested to respondent in our opinion in the prior case. Probably in reliance thereon, respondent did not appeal the prior case. He must now feel that he was enticed out on to a limb which we now saw off.

RAUM and WILBUR, *JJ., agree with this dissent.*

WILBUR, *J.,* dissenting: We are concerned here with a series of checks written to J. C. Jackson for fictitious fruit purchases. These checks, in the words of the majority, "were reflected on petitioner's books as payments for fruit purchases" and "petitioner's *taxable income* was * * * understated in each of such years." (Emphasis added.) These very same checks to J. C. Jackson (to the extent the amounts were not recovered) *again* served to reduce taxable income when they were deducted as an embezzlement loss in 1965.

The mitigation provisions are applicable assuming the offset in both instances may be described as a deduction for purposes of

the statutory provisions in issue. In *both* instances the same checks, written for the same purpose, to the same payee, for precisely the same dollar and cents amount was involved. If several people focus their attention on the same brick rambler, in the same city block, on the same corner lot, their perception will be identical whether the rambler is identified as a "house," "home," "dwelling," "abode," or some other term. In my opinion, we are confronted with a similar situation, and the use of different labels—deduction, reduction, etc.—does not alter the identity of the item involved.

The majority frustrates the remedial intent of the statute by holding that the word "deduction" is a "term of art" that will not encompass a deductible item (such as depreciation, etc.) that is run through cost of goods sold. By "term of art" the majority apparently has in mind a word that, regardless of context, will always identify for all people precisely the same phenomena. It is doubted such words exist, for as Justice Holmes said, "a word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne v. Eisner,* 245 U.S. 418, 425 (1918).

Words are simply symbols identifying categories of human experience, the medium through which principles breathe or suffocate. The broad remedial purpose underlying sections 1311-1315 suffocates under the technical interpretation of the word deduction as a "term of art" having a constant meaning throughout the Internal Revenue Code. I had previously thought that "the same phrase used in different parts of a complex statute does not necessarily carry the same meaning in two different contexts." *Folker v. Johnson,* 230 F. 2d 906, 908 (2d Cir. 1956). Even a technical and carefully defined term like reorganization (which appears to be as close as the Code gets to a "term of art") has been given an interpretation and meaning, in light of the context and purpose of the provisions involved, quite different from its purely literal meaning.[1] The words "trade or business,"

---

[1] *Gregory v. Helvering,* 293 U.S. 465 (1935). Judge Hand has said "such a corporation [in form but not substance] might be in some contexts a 'corporation'; but words are chameleons, which reflect the color of their environment, and in a tax statute 'corporation' could not have been so intended." *Commissioner v. National Carbide Corp.,* 167 F. 2d 304, 306 (2d Cir. 1948), affd. 336 U.S. 422 (1949).

like the word "deduction," a bread-and-butter term in the tax lexicon, have been given different meanings depending on context and legislative purpose.[2] Why, in the context of a broad remedial statute, involving some of the most complex provisions in the Code, the word "deduction" should be rigidly immune from these fundamental rules of statutory construction escapes me.

The majority notes that the broad remedial purpose of Congress to eliminate "a double reduction of tax, or an inequitable avoidance of tax" is qualified by legislative history indicating Congress had in mind "specified types of cases."[3] Reading the two statements together, in the words of the majority, "convinces us that Congress intended to preclude the possibility of a double tax benefit only in the specified circumstances set forth in section 1312." But this is a tautology of sorts,[4] that begs the question of what these circumstances actually are by assuming that a deduction is a "term of art" with a constant meaning inapplicable to the present case and incompatible with the broad remedial intent expressed by Congress.

No doubt Congress focused on the abuse in the context of specified factual patterns called to its attention, and the words used in expressing its remedial intent with great specificity

---

[2] Saunders, "Trade or Business Under the Code," U. So. Cal. 12th Tax Inst. 693 (1960), noting that the term "trade or business" is used 170 times in 60 different sections of the Code. The author states:

"Generalizations are probably less useful in the law of taxation than in any other branch of the law. Each tax question involves the wording and meaning of a particular Code section and each factual situation must be viewed conceptually in relation to the particular Code section in issue. * * * [Id. at 695.]"

[3] Congress, in imposing limitations on the mitigation provisions, was very concerned about directly relating an adjustment to an inconsistent position, for it is the inconsistent position rather than the double deduction that justifies suspending the statute of limitations. Maguire, Surrey & Traynor, "Section 820 of the Rev. Act of 1938," 48 Yale L.J. 509, 516 (1939). It expressed this concern often, and it is this concern that qualifies the language expressing the broad remedial purpose of Congress (rather than the language the majority refers to). Thus, the Senate report states:

"The legislation here proposed is based upon the following principles:

"(1) To preserve unimpaired the essential function of the statute of limitations, corrective adjustments should (a) never modify the application of the statute except when the party or parties in whose favor it applies shall have justified such modification by active inconsistency, and (b) under no circumstances affect the tax save with respect to the influence of the particular items involved in the adjustment.

"(2) Subject to the foregoing principles, disputes as to the year in which income or deductions belong, or as to the person who should have the tax burden of income or the tax benefit of deductions, should never result in a double tax or a double reduction of tax, or an inequitable avoidance of tax. [S. Rept. No. 1567, 75th Cong., 3d Sess. (1938), 1939-1 (Part 2) C.B. 779, 815.]"

[4] Sec. 1312 equals sec. 1312.

derive from this specific focus. But the need for interpretation is not thereby suspended when we confront a situation involving an abuse on all fours with the abuse Congress confronted, but not reflected in precisely the same factual configuration on which Congress focused. As Justice Cardozo said:

No doubt the ideal system, if it were attainable, would be a code at once so flexible and so minute, as to supply in advance for every conceivable situation the just and fitting rule. But life is too complex to bring the attainment of this ideal within the compass of human powers. * * * [Cardozo, "The Nature of the Judicial Process," p. 143 (Yale University Press 1921).]

By interpreting words to be terms of art, having a literal meaning aside from context and the remedial purpose of Congress, the majority opts for the minute at the expense of any flexibility. Since the legislative history does not indicate how Congress intended this particular ambiguity to be resolved, the resolution should be in accord with the remedial purposes of the statute.[5]

Without belaboring the point, the cases cited by the majority either involved the interplay between the estate and income taxes in the context of a much narrower statute with entirely different origins,[6] or involve the mitigation provisions in the context of adjustments to the basis of capital assets. Not only is the handling of basis a quite different question, both mechanically and substantively, than taking a deduction for cost of goods sold, but the mitigation provisions deal extensively with basis questions separate and apart from the language dealing with double deductions, making it clear the latter does not encompass basis adjustments.[7]

RAUM and DRENNEN, *JJ.,* agree with this dissent.

---

[5] This statute cuts both ways. A taxpayer would undoubtedly feel a strong sense of injustice, and rightly so, at being asked to pay a tax twice, on such a narrow technical construction, when the Government has maintained an inconsistent position.

[6] Sec. 642(g) came into the Code in 1942 in connection with the enactment of the predecessor of sec. 212. While the Senate broadened the House provision somewhat, it is clear Congress was concerned primarily with "expenses" to manage and conserve property, and not adjustments to basis (which were not dealt with at all in sec. 23 of the 1939 Code). See S. Rept. No. 1631, to accompany H.R. 7378 (Pub. L. No. 753), 77th Cong., 2d Sess. 136 (1942); H. Rept. No. 2333, to accompany H.R. 7378 (Pub. L. No. 753), 77th Cong., 2d Sess. 74, 75 (1942).

[7] See sec. 1312(7). See S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess. 448 (1954); 110 Tax Management Portfolio, Statute of Limitations-Mitigation A-25 (1965).