PHILIP WINTNER and LILLIAN WINTNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wintner v. Commissioner
Docket Nos. 1009-72, 1010-72.
United States Tax Court
T.C. Memo 1977-144; 1977 Tax Ct. Memo LEXIS 298; 36 T.C.M. (CCH) 611; T.C.M. (RIA) 770144; May 12, 1977, Filed Moses M. Falk and William B. Sandler, for the petitioners. David N. Brodsky and Gordon W. Cook, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income tax as set forth below: Calendar
Addition to Tax Docket No.
Year
Deficiency
Sec. 6653(a)
1009-72
1962
$19,206.51
$ 960.33
1963
50,712.63
2,535.63
1964
22,173.41
1,108.67
1010-72
1968
33,933.70
1,696.69
Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision only whether respondent in each of the years here in issue properly disallowed business expense deductions claimed by petitioners on their tax returns because of fictitious entries of such items of expense having been made on petitioners' books by an employee to cover up amounts embezzled, which embezzlements petitioners discovered in 1972. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, filed joint Federal income tax returns *300 for calendar years 1962, 1963, 1964 and 1968 with the District Director, Internal Revenue Service, Brooklyn, New York. [1] At the time of filing the petitions in this case, petitioners resided at Hewlett, New York. During the years here in issue petitioners kept their books and records and filed their Federal income tax returns on the cash basis. Petitioner Philip Wintner operated an electrical contracting business from prior to 1960 through 1972. During this period until early in 1972 he employed a bookkeeper and an accountant who together handled all of the bookkeeping and tax returns of the business. In January or February of 1972, the bookkeeper became ill and Mrs. Wintner began working in the business and keeping the books. Although she had no prior bookkeeping experience, *301 Mrs. Wintner soon became suspicious of certain book entries and checks.She initially noticed that three canceled checks returned by the bank were made out to "cash" but were endorsed by the bookkeeper. This prompted an examination of prior checks and records and led to the discovery that many canceled checks were missing or could not be reconciled with their stubs. A new accountant was then employed to determine the full extent of the losses that had occurred. The result of this accountant's work disclosed that approximately $20,000 a year had been embezzled by one of petitioners' employees for each of the years 1961 through 1971. Petitioners discovered the embezzlement losses in 1972 that occurred in the following years in the amounts indicated: Year
Amount
1962
$21,190.12
1963
19,335.50
1964
25,663.60
1968
19,129.34
Although the details varied slightly, the general method of the embezzlements was consistent. An employee caused checks to be drawn from petitioners' business bank accounts purportedly to pay business expenses, when in fact these expenses were not incurred or paid. The checks were then intercepted by the employee, who cashed or deposited *302 them in her account. Some of the checks were charged to payroll, but the bulk of them, including those made out to "cash," were ultimately reflected in petitioners' "Purchases & Truck Exp." account. [2] The checks were not, in fact, used to pay expenses described by the accounts. However, the amounts of these checks were reflected in the business expenses accounts to which they were purportedly drawn, and petitioners deducted those amounts as business expenses on their income tax returns. Petitioners deducted the amounts heretofore shown as the amounts of embezzlement losses discovered in 1972 as business expenses on their Federal income tax returns for 1962, 1963, 1964 and 1968. Petitioners or the accountant found dozens of checks made out to "cash" in amounts from $100 to $250 and bearing restrictive endorsements stamped on the back. Typically, the endorsements read "Pay to the Order of Bank of Commerce [petitioners' bank], Philip Wintner." These restrictive endorsements were marked over, and the signature of petitioners' bookkeeper was endorsed in blank. *303 The checks showed that they were cashed or deposited at banks other than Bank of Commerce. These checks were signed by Mr. Wintner with the understanding that they were to be used to shift funds from one of petitioners' checking accounts at the Bank of Commerce to another. The bookkeeper had no actual authority to mark over the restrictive endorsement and sign her own name. Another method of embezzlement is evidenced by a comparison of check stubs with the cash disbursements journal for 1968. The stubs show a number of checks in small amounts, typically $1.15, drawn to payees frequently paid by petitioners, including suppliers. The checks matching these stubs are missing, but the journal entries for these check numbers show entries in much larger amounts, typically $300. The journal shows that these larger amounts were charged to the "Purchases & Truck Exp." account. The payee description in the journal sometimes showed the payee on the stub, sometimes another payee, and sometimes the space was left blank. On October 27, 1965, the Internal Revenue Service took possession of petitioners' books and records, including checks, check stubs and journals, for 1962 and 1963 in connection *304 with an audit of petitioners' Federal income tax returns for those years. Mr. Wintner did not inspect the records before surrendering them. During the course of the audit and while in possession of these records, special agents of the Internal Revenue Service interviewed Mr. Wintner. After requests by Mr. Wintner, the records were returned in March of 1969. [3] No representative of the Internal Revenue Service made any comment concerning the books and records or any irregularities in them when they were returned. Mr. Wintner signed an affidavit which was received by the Internal Revenue Service on March 23, 1966. Mr. Wintner's attorney read the affidavit before Mr. Wintner signed it, but Mr. Wintner himself did not read the affidavit prior to signing it, although he had an opportunity to do so. This affidavit states: PHILIP WINTNER, being duly sworn, deposes and says: I reside at * * *, Hewlett, L.I., New York. *305 I make this statement to the Internal Revenue Service voluntarily in connection with the investigation of Morris Levine, C.P.A. However, I have been told that although my present status is that of a third party or witness, that I should regard myself, in fact, as a subject of investigation, and that I should be guided accordingly in making this statement. Morris Levine, C.P.A. of * * *, Queens, New York, has been my accountant since at least 1960. He has prepared all of my personal income tax returns for the years 1960 through 1964, inclusive, and this involved the records of my electrical contracting business. I have conducted this business under the name of Roy Thorstenson and Philip Wintner d/b/a Thorstenson Electric Construction Co. In general, I left everything connected with my bookkeeping, accounting and tax return affairs to Levine. I had virtually no discussions with him concerning my records or my income tax returns.The only information that I can recall I gave to Mr. Levine orally is some figures on amounts paid by me in cash to one I. Graber (now deceased) for contracting work. My wife gave Mr. Levine the interest and taxes on my residence. As I have already *306 stated, this is all I or my wife ever told Mr. Levine, with the possible exception that my wife may have given him some information as to medical costs. I did not get any copies of my income tax returns from Levine. I believe, but I am not sure, that I signed them in blank. I never discussed them with Levine and, therefore, was not aware of their contents. The examining agents of the Internal Revenue Service have told me that their tentative analysis of my records for the year 1963 shows some major discrepancies as follows: Per Books
Per Tax Returns
Purchases
$65,218
$74,342
Rent, Electric & Telephone
3,813
4,120
Repairs and Maintenance
698
Insurance
759
1,335
Interest
884
Miscellaneous and Advertising
774
Foreman's Expense
5,386
Travel and Selling Expense
3,471
3,956
New York Board of Fire Under-
Writers
165
622
General and Office Expense
174
727
Union Welfare
13,120
14,376
Contractors
5,407
I have been asked to explain these differences. Except for the contractor's expenses, where I did tell Levine I had some cash payments, I cannot explain the above differences. Possibly an audit by an accountant engaged by *307 me might be helpful in explaining some of these differences, but as for myself, I cannot explain them. I never told Levine that I had business expenses other than reflected by my checks. It has been pointed out to me that there are numerous items charged on my books as purchases, which on their face are questionable. I refer, for example, to checks payable to My Baby Store, Central Skin Diving and Zorn's Poultry. I state that all the questionable items were incorrectly allocated by Mr. Levine, without consulting me, that some of these items were business expenses other than purchases, and that some were personal. However, I had nothing to do with this allocation, nor did I give Levine any reason to believe that these items should have been classified as purchases or as any type of business expense. It has now been called to my attention that my son Allen was claimed as a dependent on my tax returns for the years 1961 through 1963 inclusive and that my son Joel was claimed as a dependent on my 1961 return. Levine prepared tax returns for both Allen and Joel for these years and knew that I did not support them. I did not tell Levine that I was entitled to these dependency *308 claims. I don't know how Levine arrived at the depreciation figures for automobiles and trucks claimed for the years 1960 through 1963. I had between three and four vehicles in each of these years and I did not tell Levine that I had any other vehicles. I don't know why interest income was not reported on my returns for years prior to 1962. In 1969, petitioners turned their books and records for 1964 and 1968 over to Internal Revenue Service agents in connection with audits of their returns for those years.These records were returned to petitioners in 1971. Subsequent to 1971, some of petitioners' books and records were destroyed by fire. At the time of trial in this action, petitioners' former bookkeeper had never been prosecuted for crimes related to the defalcations here involved, nor had any recovery of funds been made. However, petitioners had instituted a civil action against the bookkeeper, the former accountant and both banks involved. This action was still pending at the time of the trial in this case. On their Federal income tax returns for 1962, 1963, 1964 and 1968, petitioners did not claim any deduction as embezzlement losses, nor did they discover *309 the embezzlements in those years. However, in each year they deducted sums as business expenses that included the amounts charged to business expense accounts in the process of the embezzlements. These amounts so claimed as business expense deductions were $21,190.12, $19,335.50, $25,663.60, and $19,129.34 for the years 1962, 1963, 1964, and 1968, respectively. These amounts deducted by petitioners were not expended for the expenses indicated but were in fact diverted by petitioners' employee. Respondent in his notice of deficiency to petitioners, determined that the amounts claimed as business expenses for each of the years 1962, 1963, 1964, and 1968 were overstated by the amounts diverted by the embezzlements. The adjustment had the effect of excluding from the deductions taken by petitioners for business expenses in each of the years 1962, 1963, 1964, and 1968 the amounts improperly charged to business expense accounts in connection with the embezzlements. OPINION Petitioners seek to deduct from their income in 1962, 1963, 1964, and 1968 amounts that were reported in those years as business expenses, but which were, in fact, amounts embezzled from their business bank accounts. *310 They did not discover the embezzlements until 1972. In their petition, petitioners took the position that the amounts deducted were proper business expenses in the years of embezzlement, apparently asserting their deductibility under section 162, I.R.C. 1954. [4] Although they did not pursue this contention on brief, we nevertheless find that the position is without merit. The record is clear that the amounts were not spent for the purposes indicated on petitioners' books, but were diverted by petitioners' bookkeeper to her own use. Clearly, amounts embezzled by an employee are not ordinary and necessary business expenses of the business from which the amounts are embezzled. See Welch v. Helvering,290 U.S. 111 (1933). Petitioners' arguments on brief assert the deductibility of the embezzlements as losses under section 165. That section provides a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise, *311 " with certain limitations. Section 165(e) deals expressly with deduction of theft losses and states that "any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss." For purposes of section 165, "theft" includes embezzlement. Section 1.165-8(d), Income Tax Regs.; see B. C. Cook & Sons v. Commissioner,59 T.C. 516 (1972).The regulations under section 165(e) amplify that subsection, stating in part: A loss arising from theft shall be treated under section 165(a) as sustained during the taxable year in which the taxpayer discovers the loss. See section 165(e). Thus, a theft loss is not deductible under section 165(a) for the taxable year in which the theft actually occurs unless that is also the year in which the taxpayer discovers the loss. However, if in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, see paragraph (d) of sec. 1.165-1. [Sec. 1.165-8(a)(2), Income Tax Regs.] See also Asphalt Industries, Inc. v. Commissioner,411 F.2d 13 (3d Cir. 1969), *312 affirming a Memorandum Opinion of this Court. Section 165(e) and the regulations promulgated under it are clear in their direction that theft losses, including embezzlement losses, are to be treated as sustained and thus deductible in the year of discovery of the theft and not before. [5] Nevertheless, petitioners argue that these provisions do not apply to them and that respondent is estopped from denying deductibility in the years in which the losses occurred. Petitioners first argue that they fall within an exception to the provisions discussed above and may deduct their theft losses in the years incurred. They have failed to articulate the exception, however, and an examination of the cases cited does not disclose any exception that could conceivably apply on these facts. *313 Boehm v. Commissioner,326 U.S. 287 (1945), involved the issue of the year in which corporate stock became worthless and has no bearing on the question in the present case. Ramsay Scarlett & Co. v. Commissioner,61 T.C. 795 (1974), affd. 521 F.2d 786 (4th Cir. 1975), deals with the requirement that there be no reasonable prospect of recovery in the year of a theft loss for such loss to be deductible in the year of its discovery. While the Ramsay Scarlett & Co. case might be viewed as an exception to the rule of deduction of a theft loss in the year of discovery in the sense that deduction might be delayed until after that year, the existence of any such "exception" does not aid petitioners in justifying a deduction earlier than the year of discovery.Finally, petitioners cite B. C. Cook & Sons v. Commissioner,59 T.C. 516 (1972), [6] and emphasize that while the embezzlement loss in that case was discovered in 1965, the taxpayer was allowed to carry back to prior years the net operating loss caused by the embezzlement loss. This result, however, followed a holding directly contrary to petitioners' position *314 in the instant case. We there held that the proper year of deduction was the year of discovery, even though the embezzlements had been reflected in the taxpayer's returns for prior years as purchases in computing cost of goods sold and even though assessments of deficiencies for those years were barred by the statute of limitations. The carryback of the net operating loss was made under authority of section 172 and can in no way be viewed as an exception to the rules governing the year in which a loss is sustained. Petitioners have argued alternatively that respondent should be "equitably estopped" from denying deductibility of the embezzlement losses in the years in which they occurred. They contend that agents of respondent knew of the embezzlements and violated an affirmative duty to inform petitioners of the defalcations and that this failure to inform petitioners and respondent's retention of petitioners' books and records prevented discovery of the embezzlement losses until 1972. Under section 165(e) and section 1.165-8(a)(2) *315 of the regulations, petitioners may deduct their embezzlement losses in the years in which they occurred only if they discovered them in those years. Since they did not in fact discover the losses in those years, they could prevail here only if respondent is estopped from denying that they discovered them in those years. However, respondent can be estopped to deny such an event only if he misrepresented or concealed a material fact that was unknown to petitioners and if petitioners then acted to their detriment or failed to act in reliance upon respondent's act or omission. Lee v. Commissioner,64 T.C. 552, 555 (1975); Lodi Iron Works, Inc. v. Commissioner,29 T.C. 696, 701-702 (1958). We find that petitioners have failed to prove that respondent's agents misrepresented or concealed facts from them or that petitioners relied on any such actions. We first note that there is no evidence that respondent's agents could have discovered any embezzlements before receiving petitioners' 1962 and 1963 books and records on October 27, 1965. Petitioners do not argue that the agents knew before then. This date was after three of the four years here in *316 issue, and until that date petitioners retained possession of all of their records.Therefore, we find that respondent's agents could not have misrepresented or concealed any facts upon which petitioners could have relied in failing to discover the embezzlements during 1962, 1963, and 1964, three of the years in which they seek deductions. The first year in which petitioners possibly could have relied on any acts or omissions was 1965, and discovery in 1965 would allow deduction in 1965 at the earliest, not in 1962, 1963 or 1964. Secondly, petitioners have not proved that they in fact relied on any representations or omissions by respondent's agents in failing to discover the embezzlements during the years in which the deductions are claimed. As previously discussed, no acts or omissions of the agents could have occurred or been relied on by petitioners until after three of the four years in issue. Even with respect to the fourth year, 1968, there is no evidence of reliance. Any representations or omissions that could have occurred before or during 1968, so as to hinder petitioners' discovery in 1968, could relate only to the agents' knowledge of embezzlements made during 1962 *317 and 1963. The agents did not obtain the books and records for 1964 and 1968 until 1969. Thus, petitioners ask us to find that they relied on an alleged concealment of the embezzlements for 1962 and 1963 in failing to examine their 1968 books and records during 1968. Although it may be true that knowledge of prior embezzlements would have caused closer examination of the records of subsequent years, we find that petitioners could not reasonably, and did not, rely on any agent's representation or silence in failing to examine their books or to discover the embezzlements. There is simply no evidence that petitioners attached any significance to the fact, if indeed it was one, that the agents did not inform them of any embezzlements in connection with the audits of their books for the years here in issue. Petitioners had full possession of their books and records during the whole of each year in which they now claim a deduction. They failed to examine these records for the same reasons they failed to examine the records of other years, simply because they trusted their employees and were negligent in their supervision. Finally, petitioners have failed to prove that respondent's *318 agents misrepresented or concealed any material facts in their dealings with petitioners. While Mr. Wintner did not recall being informed expressly of any embezzlement, there is no evidence that the agents concealed from him any facts of which they had knowledge. Mr. Wintener's somewhat sketchy recollections of his interview with the special agents indicate that one topic of discussion was misappropriation of funds. At that time the agents believed that Mr. Wintner might be involved in the misappropriation himself, and therefore their statements may not have relayed to Mr. Wintner the precise nature of the misappropriations. However, this would not be a misrepresentation or concealment by the agents. On the contrary, it appears that at some point agents of respondent discussed the bookkeeping irregularities with Mr. Wintner or provided him with information sufficient to have placed him on notice of the irregularities. This is evident from the affidavit signed by Mr. Wintner. The agents discharged any duty to petitioners by providing them with this information, whether or not petitioners chose to take advantage of it. Petitioners have not established, either at trial or on brief, *319 any basis for deduction of the amounts here in issue in the years 1962, 1963, 1964 or 1968. [7] We find on this record that the amounts of defalcation losses that were deducted by petitioners as business expenses on their Federal income tax returns for 1962, 1963, 1964 and 1968 were not allowable deductions in those amounts. Decisions will be entered under Rule 155. Footnotes
1. An agreement between petitioners and respondent extending the period for assessment and collection of tax for the year 1962 was executed March 23, 1966. Another agreement for 1962 and a similar agreement for 1963 were executed January 17, 1967. Further agreements for 1962 and 1963 and agreements for 1964 were executed November 30, 1967, March 10, 1969, February 24, 1970, and March 11, 1971.↩
2. In 1963, this account did not exist. Checks were charged both to "Purchases" and to "Petty Cash & Truck Exp."↩
3. The receipt petitioners received on surrendering their records described the material surrendered as "three cartons--not examined." The letter accompanying the records when returned to petitioners also described the records as "three cartons--not examined."↩
4. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
5. Deduction for theft losses may be delayed beyond the year of discovery where there exists in that year a reasonable prospect of recovery of the amounts lost. Ramsay Scarlett & Co. v. Commissioner,61 T.C. 795 (1974), affd. 521 F.2d 786 (4th Cir. 1975); section 1.165-1(d)(3), Income Tax Regs.↩ In the instant case the issue of deductibility of the embezzlement losses in 1972, the year of discovery here, is not before the Court. However, we note that at the time of the trial in this case civil actions against the bookkeeper, the former accountant and the two banks involved had been commenced and were pending disposition.
6. This case was discussed in a later case involving the same taxpayer, B. C. Cook & Sons v. Commissioner,65 T.C. 422↩ (1975).
7. In their petition, petitioners allege that section 6406 and Rev. Proc. 64-40, 1964-2 C.B. 971, are applicable to the year 1968. Petitioners have not presented any evidence that section 6406 and Rev. Proc. 64-40↩ are relevant to the instant case. On the basis of this record, no showing has been made that these provisions have any application to this case.