T.C. Memo. 2001-207


UNITED STATES TAX COURT


GARY FRIEDMANN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 17486-96.                    Filed August 7, 2001.


<u>Gary Friedmann</u>, pro se.

<u>Keith L. Gorman</u> and <u>George D. Curran</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, <u>Judge</u>:  Respondent determined the following deficiencies in, additions to, and penalties with respect to petitioner's Federal income tax for 1989 and 1990:

| Year | Deficiency | Additions to Tax Sec. 6651(a)(1) | Penalties Sec. 6662(a) |
|------|-----------|------------------|-----------|
| 1989 | $33,472 | $4,065 | $6,694 |
| 1990 | 47,206 | 10,252 | 9,585 |

Unless stated otherwise, all section references are to the Internal Revenue Code as in effect during the years in issue.

After concessions, the issues for decision are: (1) Whether the period of limitations on assessment and collection set forth in section 6501(a) expired as to both of the years in issue, 1989 and 1990, before respondent issued the subject notice of deficiency to petitioner; and (2) whether petitioner is entitled to offset gross income by, or to deduct as business expenses under section 162, certain expenditures in the aggregate amount of $50,141 in 1989 and $97,854 in 1990 that respondent disallowed.

FINDINGS OF FACT

Some of the facts have been stipulated by the parties. The Stipulation of Facts filed by the parties and the exhibits attached thereto are incorporated herein by this reference. Petitioner resided in Moorestown, New Jersey, at the time he filed his petition in this case.

Petitioner graduated from Northeastern University in 1979 with a degree in business administration. He passed the examination to become a certified public accountant (C.P.A.) and was licensed as a C.P.A. by the State of New York in 1980. He then worked for Arthur Anderson & Co. as an auditor for 1 year, before matriculating at Georgetown

University Law Center to study law.  He graduated from Georgetown in 1984 and was awarded a J.D. degree. Petitioner then enrolled in Georgetown University's graduate program in taxation, but he completed only one semester of the two-semester program leading to an LL.M. degree in taxation.

Petitioner is currently licensed as an attorney in both the State of New Jersey and the Commonwealth of Pennsylvania.  He also holds an inactive license as a C.P.A. from the State of New York.

Petitioner has been self-employed since graduating from law school.  His business involves providing various financial and tax services to clients including:  Preparing personal, business, and employment tax returns, providing personal and business tax planning advice, providing investment advice, and reviewing and supervising the office staffs of small businesses.  Additionally, petitioner is a member of the Bar of this Court, and he has represented taxpayers as an attorney before the Court.  Petitioner has filed approximately 10 petitions on behalf of clients, and he has tried at least one case.  See Epstein v. Commissioner, T.C. Memo. 1994-34. Petitioner has also promoted various partnerships, including Friedmann Financial Number 2, Friedmann Investors

Number 1, and Friedmann Investors Number 2.  It appears that the business of these partnerships involved investments in real estate.  A number of clients of petitioner's Schedule C business, including some clients on behalf of whom the expenditures at issue in this case were allegedly made, were investors in one or more of these partnerships.  Petitioner was also the sole owner and employee of Friedmann Management Corp., which allegedly provided management services to the partnerships.

In addition to the instant case, petitioner prosecuted a suit in District Court for refund of taxes paid with respect to his joint return for 1987.  Friedmann v. United States, 107 F. Supp. 2d 502 (D.N.J. 2000).  In that case, the court granted the Government's motion to dismiss one count of the complaint on the ground that it raised issues that had not been set forth in the claim for refund, and the court granted summary judgment as to the other count of the complaint, involving certain consulting fees that petitioner claimed as an expense deduction on his Schedule C, Profit or Loss From Business.  According to the court, the consulting fees were not deductible because petitioner had admitted in his complaint that the consulting fees were not income to, nor a business expense incurred by,

petitioner but should have been reported by Friedmann Management Corp.  Id. at 511.

Petitioner also prosecuted a case in this Court involving adjustments to his joint return for 1988 that was settled before trial pursuant to an agreement of the parties.  Lastly, in 1996, he sued the United States to quash two Internal Revenue Service summonses, one of which demanded all documents and records regarding petitioner's assets, liabilities, and accounts for purposes of preparing a "collection information statement", and the other of which sought all books, records, documents, and receipts for income from all sources for purposes of preparing Federal income tax returns for 1991 through and including 1995 that had not been filed by petitioner.  Friedmann v. United States, 79 AFTR 2d 97-895 (D.N.J. 1997).  In that case, the court granted the Government's motion to dismiss petitioner's complaint.  Id.

Petitioner failed to timely file his individual Federal income tax returns for tax years 1989 through 1995. He filed delinquent returns for 1989 and 1990, the years at issue, as discussed below, but he had not yet filed his returns for tax years 1991 through 1995 at the time this case was tried.

In 1992, during the audit of petitioner's 1988 income tax return, respondent's revenue agent requested copies of petitioner's 1989 and 1990 returns.  In April 1992, petitioner gave photocopies of those returns to the agent. At that time, the agent believed that petitioner had previously filed the returns with the Internal Revenue Service.  Petitioner gave the agent no indication otherwise.  Both returns had been signed before they were photocopied, and neither return bore petitioner's original signature.  In September or October 1992, the agent began an examination of petitioner's 1989 and 1990 returns.

In due course, the revenue agent found that the Internal Revenue Service had no record of having received either the 1989 or 1990 return.  The agent notified petitioner, by letter dated November 6, 1992, that the photocopied returns would be processed as delinquent returns once the agent received a copy of each return that bore petitioner's original signature.  The agent's letter states as follows:

> As per our telephone conversation yesterday, I will process the previously submitted copies of your 1989 & 1990 1040 income tax returns as delinquent returns since our records do not indicate receipt of the aforementioned at the service centers.  However, before I can process the copies I need them to have original signa- tures.  Please provide same above the copied signature (also date) and return them to me so

that I can process them.  Please return as soon
as possible.

On March 4, 1993, before the Internal Revenue Service had received petitioner's signed 1989 and 1990 tax returns, respondent prepared a substitute return for petitioner's taxable year 1990, as authorized by section 6020(b).  On the basis of this substitute return, respondent issued a notice of deficiency to petitioner for taxable year 1990. Respondent mailed the notice of deficiency by certified mail to petitioner's last known address.  Petitioner did not claim the notice from the U.S. Postal Service and it was returned unopened to respondent by the Postal Service on June 25, 1993.

On October 4, 1993, after attempting to reach petitioner by telephone on two occasions and after writing to petitioner about the unfiled returns, a second revenue agent received copies of petitioner's 1989 and 1990 tax returns.  The copy of each return received by the agent is identical to the photocopy that petitioner previously had provided to the former revenue agent, except that it also bears petitioner's original signature and the date, October 1, 1993.

Respondent's transcript of petitioner's account for 1989 states that petitioner's 1989 return was filed on

October 4, 1993.  Respondent's transcript of petitioner's account for 1990 does not reflect that petitioner filed a return.  This is due to the fact that respondent had filed a substitute return for petitioner under section 6020(b) on March 4, 1993.

During the course of the audit of petitioner's individual income tax returns for 1989 and 1990, respondent's revenue agent discovered that the Internal Revenue Service had no record of having received returns from Friedmann Financial Number 2, Friedmann Investors Number 1, or Friedmann Investors Number 2 for taxable year 1989.  During a meeting with respondent's agent, petitioner signed copies of the 1989 Forms 1065, U.S. Partnership Return of Income, for Friedmann Financial Number 2 and Friedmann Investors Number 2.

Petitioner's individual return for 1989 reports wages, salaries, tips, etc. of $72,252.  Attached to the return is a Form W-2, Wage and Tax Statement, that reports wages of $24,252 from an employer, Dr. Carey Strom, who is also a client of petitioner's Schedule C business, as discussed further below.  Petitioner's 1989 return also reports wages of $48,000 from Friedmann Management Corp.

There is attached to petitioner's return for both 1989 and 1990 a Schedule C, Profit or Loss From Business, for a

business or profession listed as "CPA", operating under the name of "Gary Friedmann CPA".  Petitioner reported the following income and expenses for that business on the Schedules C:

|  |  | 1989 |  | 1990 |
|---|---|---|---|---|
| Gross receipts or sales |  | $177,072 |  | $175,790 |
| Returns and allowances |  | 103,784 |  | 97,854 |
| Gross income |  |  | $73,288 |  | $77,936 |
| Car and truck expenses |  | 7,946 |  | 8,584 |
| Depreciation |  | 5,096 |  | 5,096 |
| Interest |  |  |  |  |
|   Mortgage |  | -0- |  | -0- |
|   Other |  | 187 |  | -0- |
| Legal and professional servs. |  | 2,000 |  | -0- |
| Office expenses |  | 21,935 |  | 21,041 |
| Rent |  |  |  |  |
|  Machinery & equipment |  | -0- |  | -0- |
|  Other business property |  | 4,600 |  | 6,308 |
| Repairs |  | 403 |  | 632 |
| Travel, meals & entertainment |  |  |  |  |
|   Travel |  | 6,089 |  | 17,940 |
|   Meals and entertainment | $25,051 |  | $27,359 |  |
|   20% of meals | 5,010 |  | 5,472 |  |
|  |  | 20,041 |  | 21,887 |
| Utilities |  |  |  | 920 |
| Other expenses |  |  |  |  |
|   Telephone | 6,025 |  | 3,100 |  |
|   Legal | 1,600 |  | 5,000 |  |
|   Dues | 132 |  | 600 |  |
|   Assoc. | 3,600 |  |  |  |
|   Gifts | 719 |  | 1,109 |  |
|   Publications | 600 |  | 700 |  |
|  |  | 12,676 |  | 10,509 |
|  |  |  | 80,973 |  | 92,917 |
| Net profit or (loss) |  |  | -7,685 |  | -14,981 |

On May 15, 1996, respondent issued a notice of deficiency to petitioner for taxable years 1989 and 1990. This is the second notice of deficiency respondent issued with respect to petitioner's 1990 return. Among other adjustments made in this notice, respondent disallowed $50,141 of the $103,784 claimed as returns and allowances on petitioner's 1989 return, and respondent disallowed the entire $97,854 claimed as returns and allowances on petitioner's 1990 return. The notice of deficiency describes this adjustment as follows:

> The deductions of $103,784.00 and $97,854.00 shown on your 1989 and 1990 returns as returns and allowances are reduced by $50,141.00 and $97,854.00 because it has not been established that any amount more than $53,643.00 for 1989 and -0- for 1990 was for an ordinary and necessary business expense, or was expended for the purpose designated. Therefore, your taxable income is increased $50,141.00 for 1989 and $97,854.00 for 1990.

OPINION

I. Period of Limitations on Assessment and Collection

The first issue for decision is whether respondent issued the subject notice of deficiency after the period of limitations on assessment and collection under section 6501(a) had expired for both of the taxable years in issue, 1989 and 1990. Petitioner's principal position is

that the period of limitations on assessment began to run in April 1992 when he submitted photocopies of his 1989 and 1990 returns to respondent's revenue agent and that the period expired before the subject notice of deficiency was issued. According to petitioner, respondent "treated these tax returns 'as filed'", notwithstanding the fact that the returns did not bear petitioner's original signature and the fact that they were not filed at a location specified by section 6091(b)(1). Alternatively, petitioner argues that he filed each of the returns at issue by mail more than 3 years before the date of the second notice of deficiency with the result that the period of limitations on assessment and collection under section 6501(a) bars assessment of the deficiencies determined in that notice by respondent for each of the years at issue.

Section 6501 provides rules limiting the time during which the amount of any tax can be assessed. As a general rule, section 6501(a) provides that the amount of any tax shall be assessed "within 3 years after the return was filed". Sec. 6501(a). In the case of a deficiency in tax, the Internal Revenue Code further prohibits the assessment of the deficiency until a notice of deficiency has been mailed to the taxpayer and, if a petition is filed in this Court, until the decision of the Court has become final.

Sec. 6213(a). Thus, generally, a notice of deficiency must be mailed to the taxpayer before the expiration of the period of limitations on assessment and collection set out in section 6501(a).

The bar of this statute of limitations on assessment and collection is an affirmative defense, and the party raising it must plead it and carry the burden of proving its applicability. Rules 39, 142(a), Tax Court Rules of Practice and Procedure; Amesbury Apts., Ltd. v. Commissioner, 95 T.C. 227, 240 (1990); Adler v. Commissioner, 85 T.C. 535, 540 (1985); Schalekamp v. Commissioner, T.C. Memo. 1998-277. In this opinion, all Rule references are to the Tax Court Rules of Practice and Procedure. In this case, petitioner must prove that the date on which each of the subject returns was filed was more than 3 years before respondent issued the subject notice of deficiency. See United States v. Gurley, 415 F.2d 144, 147 (5th Cir. 1969); Young v. Commissioner, 208 F.2d 795 (4th Cir. 1953), affg. a Memorandum Opinion of this Court dated Apr. 10, 1953; BJR Corp. v. Commissioner, 67 T.C. 111, 121 (1976).

We note that the substitute return respondent prepared for petitioner's taxable year 1990 pursuant to section 6020(b) did not start the running of the period of limitations on assessment and collection. Section

6501(b)(3) provides: "Notwithstanding the provisions of paragraph (2) of section 6020(b), the execution of a return by the Secretary pursuant to the authority conferred by such section shall not start the running of the period of limitations on assessment and collection."

We begin with petitioner's alternative argument that he filed his 1989 and 1990 returns by mail with the Internal Revenue Service Centers more than 3 years before respondent issued the subject notice of deficiency. The evidence on which petitioner relies in support of this factual assertion is his own testimony at trial. Petitioner's testimony is vague, is not supported by any documentary evidence, such as certified mail receipts, is contradicted by respondent's records, which do not record such filings, and is unbelievable.

In the case of his 1989 return, petitioner testified: "I believe it's signed April 12th or 11th [of 1992] and that's when I apparently mailed it." (Emphasis supplied.) He further testified: "I believe I mailed it to Fresno, California" (emphasis supplied), notwithstanding the fact that he resided in New Jersey at the time. Petitioner's 1989 return states that his address is 1034 17th Street, No. 102, Santa Monica, California 90828. Petitioner states that he used a California address on his 1989 return

because he "was spending a lot of time in California" and "was intending to move there".

In the case of his 1990 return, petitioner testified that he prepared this return approximately 10 days after he prepared his 1989 return. The address listed on petitioner's 1990 return is 7 Baldwin Hill Place, Morristown, New Jersey 08057.

Petitioner testified that he gave his 1990 return to the revenue agent who was auditing his 1988 return "and mailed a copy". Petitioner's testimony regarding the filing of his 1990 return also includes the following:

> Q  And for the 1990 return, you prepared that in New Jersey, as well, correct?
>
> A  The actual return, yes.
>
> Q  And you mailed that in New Jersey, correct?
>
> A  My recollection is I gave this directly to Mr. Brokowski [i.e., the revenue agent] in New Jersey.
>
> Q  So you're saying, then, for 1990, that you never filed a return without giving one to Brokowski first. You never filed one independently for 1990.
>
> A  I think I mailed it in, as well, but I gave him a copy. I gave two--I think I gave him the original and mailed a copy, it is my recollection.
>
> Q  Would you mail a copy of a 1040 to a Service Center? Why?

A    I didn't mail it initially.  Subsequently, I mailed it.  I actually think I sent it by certified mail, as I've indicated, and I cannot locate those records.

Q    Let's go back to 1990 again.  What was--when was the first time that you filed your 1990 tax return?

A    I believe I gave it directly to Mr. Brokowski.

[Emphasis supplied.]

On the basis of the above discussion, we find that petitioner has failed to establish that he filed his 1989 and 1990 returns by mail with the Internal Revenue Service Centers more than 3 years before respondent issued the subject notice of deficiency.

Petitioner's principal argument is that he filed his 1989 and 1990 returns, and the period of limitations on assessment and collection under section 6501(a) began to run as to each tax year, in April 1992, when petitioner submitted photocopies of the returns to respondent's revenue agent.  If measured from April 1992, the period of limitations on assessment and collection expired before the subject notice of deficiency was issued.

Petitioner argues that, if respondent treats a return "as filed", then the period of limitations on assessment and collection under section 6501(a) begins to run, irrespective of whether the return was filed in a location

specified by section 6091 and the regulations promulgated thereunder, or whether it contains the taxpayer's original signature. Petitioner contends that respondent used the photocopies of petitioner's 1989 and 1990 returns in formulating the audit of petitioner's returns and, thus, treated the returns "as filed".

It has long been held that in order for the period of limitations on assessment and collection prescribed by section 6501 and its predecessors to run against the United States, a taxpayer must meticulously comply with all conditions for application of the statute. See Lucas v. Pilliod Lumber Co., 281 U.S. 245, 249 (1930); Florsheim Bros. Drygoods Co. v. United States, 280 U.S. 453 (1930); Bachner v. Commissioner, 81 F.3d 1274, 1280 (3d Cir. 1996).

As mentioned above, section 6501(a) prescribes that the tax "shall be assessed within 3 years after the return is filed". As the Supreme Court has noted, "The word 'return' is not a technical word of art." Florsheim Bros. Drygoods Co. v. United States, supra at 462. There are four elements in determining whether a document is sufficient for statute of limitations purposes: First, the document must contain sufficient data to calculate the taxpayer's tax liability; second, it must purport to be a return; third, there must be an honest and reasonable

attempt to satisfy the requirements of the tax law; and fourth, the taxpayer must execute the document under penalties of perjury.  Beard v. Commissioner, 82 T.C. 766, 777 (1984), affd. 793 F.2d 139 (6th Cir. 1986).  In order to have the effect of a return for statute of limitations purposes, a key element is that the document "must honestly and reasonably be intended as such" by the taxpayer. Florsheim Bros. Drygoods Co. v. United States, supra at 462.

Among other filing requirements, the Internal Revenue Code specifies that a return "shall be signed in accordance with forms or regulations prescribed by the Secretary", sec. 6061(a), it "shall contain or be verified by a written declaration that it is made under the penalties of perjury", sec. 6065, and it shall be filed at the place specified by the Internal Revenue Code and the regulations promulgated thereunder, sec. 6091.  In the case of the return of an individual, the general rule is that the return shall be made to the Secretary in the internal revenue district in which is located the taxpayer's legal residence or principal place of business, or it shall be made at the service center serving one of those districts. Sec. 6091(b)(1).

A return form that is not signed or sworn to, as required by the statute, does not meet the plain requirements for the filing of a return and does not start the period of limitations on assessment and collection. See Lucas v. Pilliod Lumber Co., supra; Doll v. Commissioner, 358 F.2d 713 (3d Cir. 1966), affg. T.C. Memo. 1965-191; Richardson v. Commissioner, 72 T.C. 818, 823-824 (1979). Similarly, a return that is delivered to an office other than the one specified by the Code and the regulations for filing of that return is not considered filed and does not commence the period of limitations. See O'Bryan Bros., Inc. v. Commissioner, 127 F.2d 645 (6th Cir. 1942) (gift tax return given to revenue agent), affg. 42 B.T.A. 18 (1940); W.H. Hill Co. v. Commissioner, 64 F.2d 506 (6th Cir. 1933) (return given to examining agent), affg. 23 B.T.A. 605 (1931); Winnett v. Commissioner, 96 T.C. 802 (1991) (return mailed to wrong service center); Espinoza v. Commissioner 78 T.C. 412 (1982) (taxpayer failed to prove that amended returns were filed when they were handed to a revenue agent); Green v. Commissioner, T.C. Memo. 1993-152 ("giving a delinquent return to an IRS agent does not constitute filing"); Metals Refining Ltd. v. Commissioner, T.C. Memo. 1993-115 ("Even if the IRS agents received properly executed [partnership] returns, delivery

to such agents does not necessarily constitute proper filing"); see also Kotovic v. Commissioner, T.C. Memo. 1959-177.

In this case, we find that there was no filing of the subject returns in April 1992 when petitioner gave photocopies of his 1989 and 1990 returns to respondent's revenue agent. Clearly, the revenue agent was not the prescribed place for filing those returns pursuant to section 6091(b)(1). O'Bryan Bros., Inc. v. Commissioner, supra; W.H. Hill Co. v. Commissioner, supra; Winnett v. Commissioner, supra; Espinoza v. Commissioner, supra; Green v. Commissioner, supra; Metals Refining Ltd. v. Commissioner, supra.

Moreover, there is nothing in the record to show that petitioner intended his delivery of those documents to the agent in April 1992 to constitute the filing of his returns. See Berenbeim v. Commissioner, T.C. Memo. 1992-272. Petitioner gave them to the revenue agent who had requested copies of the returns, and petitioner did not tell the agent that petitioner had not previously filed the returns with the Internal Revenue Service. Respondent's agent received the returns thinking that they were the copies that he had requested. The revenue agent reviewed the copies of petitioner's 1989 and 1990 returns and may

have used information from the returns in formulating his request for information from petitioner, but there is no evidence that respondent ever treated the copies "as filed".  To the contrary, for example, respondent took the step of filing a substitute return for 1990, pursuant to section 6020(b).

We find that petitioner has failed to establish that he filed his 1989 and 1990 tax returns more than 3 years before the date the subject notice of deficiency was issued.  Thus, petitioner has failed to prove that respondent's notice of deficiency for 1989 and 1990 is untimely under section 6501(a).

## II.  Returns and Allowances

The second issue in this case, the only substantive issue presented, involves certain payments that are reported as "returns and allowances" on the Schedules C filed as part of petitioner's 1989 and 1990 tax returns. As mentioned above, petitioner's Schedules C for 1989 and 1990 report "returns and allowances" of $103,784 and $97,854, respectively.  Respondent allowed $53,643 of the amount reported for 1989, consisting of a check drawn by petitioner on January 18, 1989, to Hackett & Co., but disallowed the rest, i.e., $50,141 in 1989 and $97,854 in 1990, on the ground that petitioner had not "established

that any amount more than 53,643.00 for 1989 and -0- for 1990 was for an ordinary and necessary business expense, or was expended for the purpose designated."

At trial, petitioner was not able to identify the amounts reported as returns and allowances on his 1989 and 1990 returns. Although petitioner's Schedules C for 1989 and 1990 report returns and allowances of $103,784 and $97,854, respectively, he introduced documents that show aggregate expenditures of $118,817.83 in 1989 (including the payment of $53,643 to Hackett & Co. that respondent allowed) and $103,349.71 in 1990. Petitioner failed to offer an acceptable explanation for these discrepancies.

According to petitioner, the subject payments can be grouped into three categories: (1) Direct refunds to clients and unreimbursed payments on behalf of clients to the Internal Revenue Service and to State tax authorities; (2) payments on behalf of one client for which petitioner was reimbursed; and (3) payments to clients for the purchase of supplies and services. Petitioner refers to the payments in the first category as "direct payments" and for convenience, we will do the same. The following is a list of the payments that petitioner claims as "returns and allowances" for each of the years at issue. The list shows the check number, date, payee, and amount

of each payment, and groups each payment into one of

petitioner's three categories:

| 1989 Check | Date | Payee | Amount | Direct Payments | Reimbursed Payments | Supplies and Services |
|---|---|---|---|---|---|---|
| 1931 | 1/7 | Mass. Div. of Employ. Security | $221.00 | $221.00 | -0- | -0- |
| 2200 | 11/19 | Jepsco | 4,500.00 | -0- | -0- | $4,500 |
| 1938 | 1/28 | IRS | 54.00 | 54.00 | -0- | -0- |
| 2083 | 5/12 | IRS | 3,585.99 | 3,585.99 | -0- | -0- |
| 2085 | 5/12 | State of R. I. | 75.01 | 75.01 | -0- | -0- |
| 2101 | 11/10 | IRS | 10,831.60 | 10,831.60 | -0- | -0- |
| 2102 | 11/10 | IRS | 3,930.09 | 3,930.09 | -0- | -0- |
| Wire | 12/12 | Hospital Trust RI | 5,010.00 | 5,010.00 | -0- | -0- |
| Wire | 12/14 | Hospital Trust Providence, RI | 12,010.00 | 12,010.00 | -0- | -0- |
| 2082 | 5/12 | IRS | 35.66 | 35.66 | -0- | -0- |
| 2476 | 8/9 | N.Y. State | 576.16 | 576.16 | -0- | -0- |
| 2174 | 7/14 | IRS | 2,382.18 | 2,382.18 | -0- | -0- |
| 2201 | 12/1 | N.Y. State | 388.29 | 388.29 | -0- | -0- |
| 2135 | 6/3 | Steven Dana | 500.00 | -0- | -0- | 500 |
| 1957 | 6/17 | IRS | 7,687.75 | 7,687.75 | -0- | -0- |
| 1958 | 6/17 | IRS | 278.92 | 278.92 | -0- | -0- |
| 2203 | 12/1 | Franchise Tax Board | 371.55 | 371.55 | -0- | -0- |
| 1974 | 6/30 | Jeff Kolton | 500.00 | -0- | -0- | 500 |
| 2403 | 7/14 | Sec. of State | 5.00 | 5.00 | -0- | -0- |
| 2122 | 12/5 | Employment Dev. Dept. | 28.16 | 28.16 | -0- | -0- |
| 2405 | 7/14 | Franchise Tax Board | 122.71 | 122.71 | -0- | -0- |
| 2175 | 7/14 | Franchase Tax Board | 250.00 | 250.00 | -0- | -0- |
| 2404 | 7/14 | Sec. of State | 5.00 | 5.00 | -0- | -0- |
| 2436 | 10/17 | Gary Chang | 3,500.00 | 3,500.00 | -0- | -0- |
| 1959 | 6/17 | Employment Dev. Dept. | 458.82 | 458.82 | -0- | -0- |
| 2401 | 7/15 | Franchise Tax Board | 1,472.94 | 1,472.94 | -0- | -0- |
| 2402 | 7/15 | IRS | 198.09 | 198.09 | -0- | -0- |
| 2442 | 10/1 | IRS | 4,639.91 | 4,639.91 | -0- | -0- |
| 2443 | 10/1 | Mass DOR | 1,156.00 | 1,156.00 | -0- | -0- |
| 2202 | 12/1 | Habhac | 400.00 | 400.00 | -0- | -0- |
| 1536 | 1/18 | Hackett & Co. | 53,643.00 | 53,643.00 | -0- | -0- |
| Total | | | 118,817.83 | 113,317.83 | -0- | 5,500 |
| Amount reported on return | | | 103,784.00 | | | |
| Difference | | | 15,033.83 | | | |

| 1990 Check | Date | Payee | Amount | Direct Payments | Reimbursed Payments | Supplies and Services |
|---|---|---|---|---|---|---|
| 1758 | 2/20 | State of Cal. | $5.00 | $5.00 | -0- | -0- |
| 1730 | 2/28 | N.Y. State | 470.29 | 470.29 | -0- | -0- |
| 1731 | 2/28 | N.Y. State | 114.70 | 114.70 | -0- | -0- |
| 1732 | 2/28 | N.Y. State | 2,850.38 | 2,850.38 | -0- | -0- |
| 1738 | 3/7 | IRS | 791.12 | 791.12 | -0- | -0- |
| 1737 | 3/7 | Mass. | 2,350.00 | 2,350.00 | -0- | -0- |
| 2269 | 3/9 | Jeffrey Kolton | 12,500.00 | 12,500.00 | -0- | -0- |
| 124 | 7/10 | N.Y. State | 5,337.57 | 5,337.57 | -0- | -0- |
| 125 | 7/15 | N.Y. State | 1,128.13 | 1,128.13 | -0- | -0- |
| 189 | 11/20 | Said Dermarkar | 2,000.00 | 2,000.00 | -0- | -0- |
| 209 | 12/10 | IRS | 235.08 | 235.08 | -0- | -0- |
| 217 | 12/21 | N.Y. State | 150.00 | 150.00 | -0- | -0- |
| 215 | 12/12 | IRS | 228.64 | 228.64 | -0- | -0- |
| 1878 | 1990 | Carey Storm | 930.00 | 930.00 | -0- | -0- |
| 242 | 12/31 | Employment Dev. Dept. | 7,000.00 | -0- | $7,000.00 | -0- |
| 164 | 10/1 | US Dept. of Treasury | 12,000.00 | -0- | 12,000.00 | -0- |
| 163 | 9/26 | City of Beverly Hills | 2,679.75 | -0- | 2,679.75 | -0- |
| 1799 | 5/12 | Employment Dev. Dept. | 59.02 | 59.02 | -0- | -0- |
| Wire | 2/16 | Shawmut Bros. | 30,010.00 | 30,010.00 | -0- | -0- |
| 2292 | 2/20 | Stewart Gleischman | 18,500.00 | 18,500.00 | -0- | -0- |
| Wire | 11/28 | Security-Los Angeles | 4,010.00 | 4,010.00 | -0- | -0- |
| Total | | | 103,349.68 | 81,669.93 | 21,679.75 | -0- |
| Amount reported on return | | | 97,854.00 | | | |
| Difference | | | 5,495.68 | | | |

At the outset, we note that there is a fundamental difference between expenditures that constitute "returns and allowances" and expenditures that are treated as business deductions under section 162. See <u>Beatty v. Commissioner</u>, 106 T.C. 268, 273 (1996); <u>Max Sobel Wholesale Liquors v. Commissioner</u>, 69 T.C. 477 (1977), affd. 630 F.2d 670 (9th Cir. 1980); <u>B.C. Cook & Sons, Inc. v. Commissioner</u>, 65 T.C. 422, 428 (1975), affd. per curiam 584 F.2d 53 (5th Cir. 1978); see also sec. 1.61-3(a), Income Tax Regs. The former expenditures are taken into account in computing the gross income from a business activity. See <u>B.C. Cook & Sons, Inc. v. Commissioner</u>, <u>supra</u> at 428. Strictly speaking, they are not deductions

and are not subject to the various limitations on deductions claimed under section 162.  See <u>Metra Chem Corp. v. Commissioner</u>, 88 T.C. 654, 661 (1987); <u>B.C. Cook & Sons, Inc. v. Commissioner</u>, <u>supra</u>.

As to returns and allowances, a taxpayer is required to maintain records that are sufficient to substantiate the amount claimed on his or her return.  Sec. 6001.  A taxpayer must establish a direct connection between an expenditure claimed as an offset of gross receipts and the activity giving rise to the gross receipt.  See <u>Max Sobel Wholesale Liquors v. Commissioner</u>, <u>supra</u> at 483 (rebate treated as a reduction of gross income "where the rebate was a part of the transaction of sale"); see also <u>Shriver v. Commissioner</u>, 85 T.C. 1, 8 (1985).

As to deductions under section 162(a), a taxpayer is required to maintain records that are sufficient to substantiate the deductions claimed on his or her return. Sec. 6001.  Section 162 generally allows a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Such expenses must be directly connected with or pertain to the taxpayer's trade or business.  Sec. 1.162-1(a), Income Tax Regs.  Petitioner bears the burden of proving his

eligibility for offsets to gross income or deductions under section 162(a).

Petitioner reported the subject expenditures as returns and allowances for both 1989 and 1990 and reduced the gross income reported on his Schedule C for each year by the total expenditures for the year.  In his posttrial briefs, petitioner's principal position is that the subject expenditures are "ordinary and necessary and deductible under section 162."  It is not clear whether petitioner also takes the position that the subject expenditures are "returns and allowances" that offset the gross receipts realized from the business reported on petitioner's Schedules C.  However, it is not necessary to sort out petitioner's legal position because we find that petitioner has failed to adequately substantiate any of the subject expenditures either as an offset of the gross receipts of his Schedule C business or as an ordinary and necessary business deduction.

During his testimony at trial, petitioner sometimes compared the fees that he claims to have received during 1989 and 1990 from the clients of his Schedule C business with the payments treated as returns and allowances that he claims to have made to, or on behalf of, some of those clients.  As was true in the case of the returns and

allowances, at trial petitioner was unable to itemize the fees composing the gross receipts reported on his Schedules C for 1989 and 1990. The totals from the two lists of fees that petitioner introduced at trial do not match the gross receipts reported on the Schedules C filed with his returns.

In any event, for both of the years in issue, the following schedule repeats the lists of fees that petitioner introduced at trial, it shows the payments allegedly made by petitioner to, or on behalf of, each of his clients, and it shows the net amounts for each client:

| | Fees | | Payments | | Net | |
| Client | 1989 | 1990 | 1989 | 1990 | 1989 | 1990 |
|---|---|---|---|---|---|---|
| Jeff Abrams | $12,213 | -0- | $650.47 | $228.67 | $11,562.53 | $-228.67 |
| Automatic systems | 24,375 | -0- | -0- | -0- | 24,375.00 | -0- |
| David Baumberg | 500 | $1,500 | -0- | -0- | 500.00 | 1,500.00 |
| Faith Burns | 2,815 | -0- | 5,795.91 | -0- | -2,980.91 | -0- |
| Gary Chang | -0- | 25,830 | 3,872.71 | -0- | -3,872.71 | 25,830.00 |
| Norman Dana | 4,122 | 2,442 | -0- | -0- | 4,122.00 | 2,442.00 |
| Eric Friedmann | 7,374 | -0- | 3,585.99 | 8,772.94 | 3,788.01 | -8,772.94 |
| Mark Grayson | -0- | 4,703 | -0- | -0- | -0- | 4,703.00 |
| Bill Habelow | 2,000 | -0- | 7,687.75 | 2,350.00 | -5,687.75 | -2,350.00 |
| Hackett & Co. | 61,643 | -0- | 400.00 | -0- | 61,243.00 | -0- |
| Habsco | -0- | -0- | 53,643.00 | -0- | -53,643.00 | -0- |
| Emily Harris | -0- | 2,880 | -0- | -0- | -0- | 2,880.00 |
| Thomas Hickey | 14,000 | -0- | -0- | -0- | 14,000.00 | -0- |
| Robert Hastings | -0- | 7,955 | 3,382.29 | 941.12 | -3,382.29 | 7,013.88 |
| High Comps-Callan | 16,000 | 31,278 | 54.00 | -0- | 15,946.00 | 31,278.00 |
| Art Jacob | 4,500 | -0- | -0- | -0- | 4,500.00 | -0- |
| Jeff Kolton | 4,272 | -0- | 500.00 | 12,500.00 | 3,772.00 | -12,500.00 |
| Margaret Lynch | 5,159 | -0- | 31,856.70 | -0- | -26,697.70 | -0- |
| Jeanne Lynch | 400 | 16,961 | -0- | -0- | 400.00 | 16,961.00 |
| Scott Mitchell | -0- | 1,000 | -0- | -0- | -0- | 1,000.00 |
| Albert Pachew | -0- | 4,980 | -0- | -0- | -0- | 4,980.00 |
| Victoria Shulman | -0- | 6,627 | -0- | -0- | -0- | 6,627.00 |
| Carey Strom | -0- | 28,560 | 38.16 | 22,668.77 | -38.16 | 5,891.23 |
| Corey Tynam | -0- | 51,250 | -0- | -0- | -0- | 51,250.00 |
| Brain Wayset | 6,374 | -0- | -0- | -0- | 6,374.00 | -0- |
| Steven Dana | -0- | -0- | 500.00 | -0- | -500.00 | -0- |
| Said Dermarkar | -0- | -0- | -0- | 2,000.00 | -0- | -2,000.00 |
| Carissa Drucker | -0- | -0- | 1,671.03 | 4,010.00 | -1,671.03 | -4,010.00 |
| Stewart Gleischman | -0- | -0- | 458.82 | 18,740.08 | -458.82 | -18,740.08 |
| Jepsco/Epstein | -0- | -0- | 4,721.00 | 30,010.00 | -4,721.00 | -30,010.00 |
| Joblon | -0- | -0- | -0- | 1,128.13 | -0- | -1,128.13 |
| Total | 165,747 | 185,966 | 118,817.83 | 103,349.71 | 46,929.17 | 82,616.29 |
| Amount reported | 177,076 | 175,790 | 103,784.00 | 97,857.00 | | |
| Difference | -11,329 | 10,176 | 15,034.00 | 5,493.00 | | |

As shown above, petitioner claims to have made payments in 1989 of $118,817.83 or 71.68 percent of the fees received in that year and payments in 1990 of $103,349.71 or 55.57 percent of the fees received in that year. The above schedule shows that petitioner allegedly made substantial payments to persons from whom no fees are

listed for 1989 or 1990.  The net payments to clients in
this category are as follows:

|  | 1989 | 1990 |
|---|---|---|
| Steven Dana | $-500.00 | -0- |
| Said Dermarkar | -0- | $-2,000.00 |
| Carissa Drucker | -1,671.03 | -4,010.00 |
| Stewart Gleischman | -458.82 | -18,740.08 |
| Jepsco/Epstein | -4,721.00 | -30,010.00 |
| Joblon | -0- | -1,128.13 |
|  | -7,350.85 | -55,888.21 |

The above schedule also shows that petitioner allegedly
made payments to a number of clients, including his
parents, that substantially exceeded the amount of fees
petitioner received from those clients.  The net payments
to clients in this category are as follows:

|  | 1989 | 1990 |
|---|---|---|
| Faith Burns | -$2,980.91 | -0- |
| Eric Friedmann | 3,788.01 | -$8,722.94 |
| Bill Habelow | -5,687.75 | -2,350.00 |
| Jeff Kolton | 3,772.00 | -12,500.00 |
| Margaret Lynch | -26,697.70 | -0- |

Another preliminary point should be noted.  In his
reply brief, petitioner implies that he was unable to
produce some records necessary to substantiate the "returns
and allowances" reported on his returns because certain of
his records had been lost.  In discussing the evidence that
he adduced to substantiate the direct payments, petitioner
states that his "business records were lost when he shipped

the records from California to New Jersey with the United Parcel Service."  In discussing the evidence adduced to substantiate the payments to clients for professional services and supplies, he also states that "his original books and records were lost by United Parcel Service when the records were shipped from California to New Jersey."

At trial, petitioner made no suggestion that any records necessary to substantiate the returns and allowances claimed on his return had been lost.  To the contrary, during his opening statement, petitioner mentioned certain business records that allegedly had been lost, but he limited that discussion to the substantiation of certain business deductions that are no longer at issue in this case.  When it came to the returns and allowances at issue here, petitioner made it clear that he never had records of any of these expenditures.  Petitioner stated as follows:

> In other areas, for example, we'll get to the area of returns and allowances.  In this area, often the client had a problem with the IRS or a government agency and I advanced taxes on their behalf, without any expectation of getting the money back from them, it--from them.  And unfortunately, at that time, I was perhaps lax that I didn't have business contracts or even key business records.  There were just oral agreements with respect to the treatment of these items.  Obviously, it's a practice of--it's not an ideal practice and <u>it's not that these records were lost</u>.  It's just that I didn't keep them at

the time.  They were oral agreements. [Emphasis
supplied.]

Furthermore, after petitioner completed his direct
testimony regarding returns and allowances, and before
discussing the records that he allegedly lost in ship-
ping, he stated:  "As mentioned earlier, I shipped some
information--I'm done with the returns and allowances at
this point."  Thus, petitioner again made it clear that
the records allegedly lost in shipping did not involve
"returns and allowances."  Finally, at trial, petitioner
stated:  "As such, my business logs were in there detailing
in the instance of travel and entertainment, who I
entertained and what--and all the other requirements of
Section 274(d)."  Petitioner did not testify at trial that
any of the documents that were allegedly lost involved
amounts reported on his returns as "returns and
allowances".

Moreover, on the basis of the record of this case,
we would have difficulty finding that petitioner lost any
business records as a result of a shipment from California
to petitioner's home in Moorestown, New Jersey.  None of
the documents introduced by petitioner substantiate a lost
shipment of records from California to Moorestown.  The
documents on which petitioner relies, consisting of two

receipts for the shipment that were filled out by petitioner on United Parcel Service forms and a Damage Tracer Copy that was issued by UPS, fail to show that any part of the shipment was lost. To the contrary, according to a handwritten phone message, a representative of UPS telephoned petitioner and stated that all seven boxes of the shipment had been delivered. The only formal communication from UPS concerning this shipment is the Damage Tracer Copy which states that petitioner had reported damage to a "Panasonic EASA Phone". There is no document from UPS to substantiate petitioner's assertion that "two bags" were lost and never recovered.

A.  Refunds to Clients and Unreimbursed Payments to the Internal Revenue Service and to State Tax Authorities

As shown in the above schedules, petitioner claims offsets to gross receipts or deductions under section 162 for the aggregate amounts of direct payments in 1989 and 1990. For 1989, petitioner claims offsets or deductions in the form of direct payments totaling $113,317.83, including the $53,643 payment to Hackett and Co., sometimes referred to as Habsco, that was allowed by respondent, and for 1990 he claims offsets or deductions in the form of direct payments in the aggregate amount of $81,669.93. In his posttrial briefs, petitioner asserts that he made the

subject payments to clients, to the Internal Revenue Service, or to State tax authorities in order to resolve "tax problems that was [sic] due to an error or omission made by the Petitioner."  According to petitioner:  "These [payments] were for tax services that I performed that there was some kind of problem with."  According to petitioner, in each case after "negotiations with client(s) and once the Petitioner and the client came to an oral agreement that the Petitioner would pay the tax bill", "the direct payment was made to fully settle the legal dispute between the Petitioner and his client."  Petitioner asserts that "he did not carry professional malpractice insurance", and he orally agreed with his clients to make each of the payments "to avoid litigation and to retain customers." Furthermore, according to petitioner, each of the direct payments was made "to resolve a tax problems [sic] that was due to an error or omission made by the petitioner." Petitioner states:  "There was no connection between the 'direct payment' and billing", except in the case of the reimbursed payments, discussed below.

To prove the nature of the subject direct payments, petitioner relies on his own testimony, copies of canceled checks or other evidence of payment, such as wire transfers, and in several instances, copies of the bills

or statements issued by the taxing authority.  The documentary evidence petitioner introduced supports a finding that petitioner made payments to his clients, to the Internal Revenue Service, and to various State tax administrators.  However, the documentary evidence does not explain why the payments were made, what connection any of the payments had to petitioner's Schedule C business, or why these payments are ordinary and necessary business expenses.  For this, petitioner relies upon his own uncorroborated testimony at trial.  As we have often stated, we are not required to accept a taxpayer's self-serving testimony.  See, e.g., Neidringhaus v. Commissioner, 99 T.C. 202, 219-220 (1992); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976).

We have difficulty accepting petitioner's testimony that he made 27 payments totaling $59,674.83 (i.e., total direct payments of $113,317.83 less the amount allowed by respondent, $53,643) in 1989 and 18 payments totaling $81,669.93 in 1990 to settle malpractice claims with 17 clients.  Petitioner claims to have made these payments, but he failed to produce documents of any kind, such as agreements, correspondence, or memoranda, to substantiate

the nature of any of the payments.  We also find it significant that petitioner introduced no testimony or corroboration from any of his clients concerning the nature of these payments.  We agree with respondent that this raises an inference that such testimony would not support petitioner's case.  See McKay v. Commissioner, 89 T.C. 1063, 1069 (1987), affd. 886 F.2d 1237 (9th Cir. 1989); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947); Metals Refining Ltd. v. Commissioner, T.C. Memo. 1993-115.

As mentioned above, petitioner relies entirely on his own testimony at trial to substantiate the subject payments.  However, petitioner's testimony is extremely vague.  He does not describe the services that he provided to the subject clients or the nature of the problem with those services that prompted him to make the payment or payments with respect to that client.  The following example illustrates petitioner's vague testimony. Petitioner's testimony regarding two payments made on behalf of Faith and Joseph Burns is as follows:

> The next items is items 22-19, which has to
> do with Faith and Joseph Burns.  I paid the
> Internal Service directly $4,640 and the State
> of Massachusetts, which is item 20-22-20--
> $1,156.  They paid me fees in 1989 of $2,815.

In response to questions from the Court about the fact that petitioner's payments exceeded the fees received, petitioner gave the following explanation:

>They were paid out more in aggregate than I received in fees, yes, and these had to do with old matters existing prior to 1989 that were ultimately paid or resolved in 1989. It's not that I intended to lose money on this proposition. It's just that old matters were resolved.
>
>    Now, people say, Gary, you could have not paid these matters, had the clients either pay them or whatever, and let them sue you, and then these would have been deductible at some time down the road, you would have incurred legal fees and the amounts may have been larger due to interest and penalties and you would have been caught up in court. But I decided to resolve older matters probably pertaining to years '82 to '84, particularly in the--well, these matters were resolved--well, problems arising from earlier years were resolved and negotiated with the clients in '89 and these were paid.
>
>    There is no real relationship to the $2,815 in fees received in 1989 and the amounts paid. Obviously, in the case of Dr. Chang, which is items 13, 14, and 15, which aggregate $400, and item 21, which is a refund of $3,500--well, those three amounts are minuscule in comparison to the 1990 collections of $25,830.
>
>    So there is no correlation between the two. The reason I mentioned the fees is to show that they were, one, current clients, that I retained them, not obviously to show that this agreement had been reached and to show some perspective that, by and large, for most of the clients, the fees taken in and the retention of the relation-ship exceeded the amounts that were paid out in what would have been a divisive matter.

Well, if these things were not resolved amicably, it could have been a divisive matter, which would have--could have led to litigation, as I said, I didn't have malpractice insurance, and also, a loss of clients and client good will. That's my rationale for paying them.

In effect, petitioner states that the subject payments were made "to resolve older matters probably pertaining to years '82 to '84". Petitioner gives no explanation of the matters that were resolved.

Petitioner's testimony concerning the payments made on behalf of his parents similarly fails to describe the nature of those payments. Petitioner's testimony is as follows:

The next check is 50--is 22-3, which was paid directly to the Internal Revenue Service on behalf of my father, Eric Friedmann. It's actually my parents, Eric and Phyllis Friedmann, for a tax problem. I would just note that my parents were clients and in the year 1989, they paid me taxable fees of $7,374. When I say they paid me fees, these are all reflected in my income schedules that were reconstructed, that are found in files 20-J for 1989 and 21-J for 1990. And these have been accepted by the Internal Revenue Service for purpose--as noted in the audit work papers, although they don't tie in precisely to the income per the tax return.

The next item has to do with Eric Friedmann, who is, again, my father. These had to do with items 15-A2, A3, A4, and A10. The first one being payment directly to New York State on behalf of him of $470.29. The next one is 15-A3, had to do with payments directly to New York State in the amount of $114.70. The next one is 15-A4, which is payment directly to New York

State of $2,880.38, and the last one is 15-A10, which has to do with payments directly to New York State of $5,337.57.  The checks are in this file, Your Honor.

Petitioner claims an offset to income or a deduction for payments made in 1989 in the amount of $31,856.70 allegedly on behalf of Ms. Margaret Lynch.  His testimony regarding those payments is as follows:

The next item is number 22-4.  Again, these are all within file 16-J, having to do with the taxpayer Margaret Lynch, and I paid $75--$75.01 to the State of Rhode Island on her behalf, for a tax problem.

In items 23, I paid the IRS, Internal Revenue Service, directly, $10,831.50 on her behalf.  Item 24, I paid the Internal Revenue Service $3,930.09 on her behalf.  Items 4-23 and 24 are direct checks to either Rhode Island or the Internal Revenue Service.

In addition, items 30(a) and 30(b) are direct wires or returns of funds to Margaret Lynch, as agreed upon, in the amounts of $5,010, in the instance of 30(a), and in the instance of 30(b), $12,010.  Margaret Lynch, in 1989, paid me fees--and these were all, as I say, agreed upon and accepted.  Margaret Lynch paid me fees of $5,159 and also in that period, her sister, Jeanne Lynch, who is a client and had an influence over her or their opinion of me counted, they spoke quite frequently, paid me fees of $400 in 1989 and in 1990, paid me fees of $16,961.

Again, I believe these offsets--there's two components of the offsets here.  One is money given directly back to the client, which I consider to be return of fees, and the other is expenses that I paid directly for the client, that would be items 24, 23 and 24, and the two

wires, items 30 and 30(a) and 30(b) were funds
paid directly--wired directly to the client's
personal account.

As true throughout petitioner's testimony at trial,
petitioner offers no explanation for the nature of the
services he provided to Ms. Lynch, the problems that arose
with respect to those services, or the reason for his
payment of those funds.

Finally, in one instance, petitioner claims to have
made a direct refund of fees to Dr. Strom in the amount of
$930.  When asked about this payment at trial, petitioner
stated as follows:

> Well, basically, it had to do with--I looked
> after his investments and as well as doing his
> personal--doing his taxes and corporate work, and
> he didn't feel the investments performed as well
> as expected.  Some of this had to do with
> indemnities and the value of some of his
> investments.

For the above reasons, we find that petitioner has
failed to meet his burden of proving that any of the direct
payments offset his gross receipts or can be deducted under
section 162.  Accordingly, we hereby sustain respondent's
determination as to these payments.

B.    Supplies and Services

Included among the returns and allowances reported on his 1989 return are payments that petitioner claims to have made to clients to purchase "supplies and services". Petitioner relies upon his own testimony and copies of canceled checks to substantiate this claim.  Petitioner testified that the payments in this category, totaling $5,500, consist of payments to three clients, Mr. Dana, Mr. Kolton, and Jepsco, in the amounts of $500, $500, and $4,500, respectively.  At trial, petitioner testified that the $500 payment to Mr. Dana was a fee "for supplies that he provided for me in my business", the $4,500 payment to Jepsco was "for consulting fees", and the $500 payment to Mr. Kolton was "for legal services * * * in a probate matter" rendered by Mr. Kolton.  Petitioner testified further that Mr. Kolton assisted petitioner with a probate matter and "looked up some stuff and filed a paper". Petitioner introduced copies of three canceled checks payable to Mr. Dana, Mr. Kolton, and Jepsco containing the notations "fee", "serv.", and "consulting", respectively, in the memo section of the checks.

The evidence offered by petitioner is insufficient to substantiate that petitioner is entitled to offset gross income by, or to deduct, these amounts.  Petitioner's

testimony regarding the payments fails to provide sufficient information regarding the "supplies" purchased or the "consulting and legal work" actually performed. As stated earlier, we are not required to accept a tax-payer's self-serving testimony. See, e.g., Neidringhaus v. Commissioner, 99 T.C. at 219-220; Tokarski v. Commissioner, 87 T.C. at 77; Hradesky v. Commissioner, 65 T.C. at 90. For the above reasons, we hold that petitioner has failed to establish that he is entitled to a deduction for these payments, and we sustain respondent on this issue.

C. Reimbursed Payments Allegedly Made on Behalf of One Client

Included among the subject returns and allowances for 1990 are payments totaling $21,679.75, that petitioner allegedly made on behalf of a client, Dr. Strom, for licensing fees and tax liabilities. Petitioner asserts that Dr. Strom reimbursed petitioner for these payments, as discussed below, and that they should be treated as offsets to gross income or as ordinary and necessary business expenses under section 162. In passing, we note that petitioner allegedly made two other payments on behalf of or to Dr. Strom in 1990, $59.02, and $930, that petitioner also treated as "direct payments".

The evidence presented by petitioner regarding the payments totaling $21,679.75 consists of petitioner's testimony, copies of canceled checks, and a copy of a check stub. Petitioner testified that he made three separate payments on behalf of Dr. Strom in order to avoid penalty and interest charges that Dr. Strom had incurred in prior years for late fee payments and tax deposits. According to petitioner's testimony and the copies of the canceled checks petitioner offered as evidence, petitioner paid $2,679.75, on September 26, 1990, to the City of Beverly Hills for Dr. Strom's personal medical licensing fee, he paid $12,000 to the U.S. Department of the Treasury on October 1, 1990, for Dr. Strom's 1990 third quarter Federal payroll tax deposit, and he paid $7,000 on December 31, 1990, to the Employment Development Department for Dr. Strom's California employment tax liability.

Petitioner claims to have reported receipts in 1990 from Dr. Strom in the aggregate amount of $28,560. Petitioner testified that "Dr. Strom paid me in two checks that year". According to petitioner, the second check in the amount of $26,700 or $26,200 was paid on December 19, 1990. Petitioner testified:

> I actually wrote out the name to Gary Friedmann, wrote the word fee, wrote the amount and wrote out the check. Dr. Strom signed the check and gave it to me and it's his handwriting in there

on check 3009 where he writes in the date of 12/19/90, and writes out reimbursement, and then $6,500 annual.

\*   \*   \*   \*   \*   \*   \*

It's the check stub that I'm referring to.  The check--the original check was returned to Dr. Carey Strom.  There is my writing on this register and in addition to that, Dr. Strom, in aggregate, paid me, in 1990, $28,560 for--that is--there are two payments to me at least equal that amount.  This amount represents $26,200. There was also other checks representing $2,300 that reflected in income.

Petitioner summarized his testimony regarding this matter as follows:

Getting back to returns and allowances for 1990, I just have one point.  On December 19th, 1990, Dr. Strom paid me the $26,700, of which 6,500 was fees and the rest was reimbursement.

That was attributable, and this was our agreement, this is my testimony, the reimbursement component was attributable to taxes paid to Beverly Hills, the City of Beverly Hills in September of that year of $2,679.  Withholding taxes or payroll taxes the entity owed that I paid on October 1st of that year, 1990, of $12,000 and it contemplated me paying state unemployment tax--state employment taxes of $7,000 on December 31st, 1990, which was subsequent to the payment that was made on December 19th, 1990.

You have checks that I paid all those three amounts.  That's all I wish to say about that.

And I believe that the total amount was an advance, aside from the $6,500 fee, and that these other amounts were just paid as a flow-through.

As we understand it, petitioner claims that the second payment that he received from Dr. Strom in the amount of $26,700 consisted of an annual fee of $6,500 and the reimbursement of three payments that petitioner allegedly made on behalf of Dr. Strom in the aggregate amount of $21,679.75 (viz, $2,679.75, $12,000, and $7,000). One problem we have with petitioners's testimony is that the total of the fees and reimbursements is $28,179.75, or $1,479.75 more than Dr. Strom's check of $26,700. Another problem we have with petitioner's testimony is that he does not explain why, in preparing the check for Dr. Strom's signature, to reimburse himself for payments made on Dr. Strom's behalf, petitioner included the $7,000 payment to the Employment Development Department that would be due on December 31, 1990, several days later. We do not understand why petitioner did not simply prepare a check for this upcoming payment directly from Dr. Strom to the Employment Development Department.

Petitioner contends that the payments made on Dr. Strom's behalf in 1990 are deductible because petitioner received reimbursement for those payments from Dr. Strom, and petitioner included the reimbursements in computing gross income for that year. Petitioner states in his posttrial brief that he included fees of $28,560, from

Dr. Strom as gross receipts on Schedule C of his 1990 return. As mentioned above, petitioner produced a handwritten list of the names of his clients and the amounts that petitioner allegedly received from these clients in 1990. According to the handwritten list, petitioner included $28,560 from Dr. Strom in the calculation of his gross receipts for that year.

We find that the evidence petitioner adduced is insufficient to establish that amounts reimbursed by Dr. Strom were included in the computation of petitioner's gross receipts for 1990. According to the handwritten list, petitioner's gross receipts for 1990, $185,966, does not equal the gross receipts reported on Schedule C of petitioner's 1990 return, $175,790. Petitioner has failed to adequately explain this inconsistency. Furthermore, the handwritten list of fees introduced at trial is not supported by any other evidence, such as books, receipts, or other documentation.

In addition, petitioner's testimony regarding the fees of $28,560 received from Dr. Strom in 1990 and allegedly included in his gross receipts for that year is confusing. At trial, petitioner testified that Dr. Strom's fees of $28,560 consisted of a $26,200 payment and "other checks representing $2,300". In his opening brief, however,

petitioner contends that the $28,560 payment comprised a $960 payment and a $27,600 payment. Subsequently, in his answering brief, petitioner contends that the $28,560 payment comprised a $26,700 payment, consistent with the amount listed on the copy of the check stub introduced at trial, and a $1,860 payment.

Furthermore, petitioner maintained a multifaceted business relationship with Dr. Strom. Petitioner's returns report wages from Dr. Strom's professional corporation totaling $24,252 in 1989 and $18,409 in 1990. Dr. Strom was also a client of petitioner's Schedule C business and, in that connection, petitioner claims to have made a direct payment to Dr. Strom of $930 because Dr. Strom "didn't feel the investments performed as well as expected". Dr. Strom was also an investor in one or more of the partnerships petitioner promoted. In view of these relationships, petitioners's testimony is too vague to substantiate the offset or deductions he claimed for 1990 in the aggregate amount of $21,679.75. In this connection, we also note the fact that petitioner did not produce to respondent the retainer agreement between himself and Dr. Strom or seek to introduce the agreement at trial.

As a result of the inconsistent and insufficient evidence he presented, petitioner has failed to establish

that he is entitled to a deduction for the payments, totaling $21,679.75, that he made on behalf of Dr. Strom. We hereby sustain respondent on this issue.

On the basis of the foregoing, and concessions,

<u>Decision will be entered</u>

<u>under Rule 155</u>.